2 P.3d 264

2000-NMSC-013

STATE of New Mexico, Plaintiff–Appellant,

v.

Jesus Diaz NUNEZ and David Michael Chavez, Defendants–Appellees.

State of New Mexico, Plaintiff–Appellee,

v.

Edward Vasquez, and Alex Gallegos, Defendants–Appellants.

State of New Mexico, Plaintiff–Appellee,

v.

Marguerite Vasquez, Defendant–Appellant.

Nos. 23,796, 23,860.

Supreme Court of New Mexico.

Dec. 30, 1999.

Rehearing Denied May 10, 2000.

Patricia A. Madrid, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, for State of New Mexico.

Liane E. Kerr, Albuquerque, for Jesus Diaz Nunez.

Reber Boult, Albuquerque, for David Michael Chavez.

Phyllis H. Subin, Chief Public Defender, C. David Henderson, Assistant Appellate Defender, Susan Gibbs, Assistant Appellate Defender, Santa Fe, for Edward Vasquez and Marguerite Vasquez.

D. Eric Hannum, Albuquerque, for Alex Gallegos.

S. Rafe Foreman, Flower Mound, TX, for Saul Salcido.

Randi McGinn, Allegra C. Carpenter, Albuquerque, for Amicus Curiae New Mexico Criminal Defense Lawyer's Association.

Mark L. Drebing, Albuquerque, for Amicus Curiae City of Albuquerque and Albuquerque Police Department.

## OPINION

FRANCHINI, Justice.

{1} This case concerns five consolidated appeals in which each of the defendants faced criminal charges for the possession or sale of drugs, and were also subject to the civil forfeiture of property, such as vehicles and currency, that was allegedly associated with the crime. These appeals each raise the same issue: whether civil forfeiture under the Controlled Substances Act, NMSA 1978, §§ 30–31–1 to –41 (1972, as amended through 1997), is punishment and is limited by the protections against double jeopardy guaranteed by the New Mexico Constitution, N.M. Const. art. II, § 15, and the double-jeopardy statute, NMSA 1978, § 30–1–10 (1963). We

conclude that civil forfeiture under the Act is punishment for the purposes of New Mexico's protections against double jeopardy.

## I. FACTS

{2} The double-jeopardy issue we address today was properly preserved at the trial level by all the defendants in these consolidated cases. Some of the defendants raised issues other than the one resolved by this opinion. Because we decide all the cases on double-jeopardy grounds, we will not address any other issues.

### A. State v. Nunez

{3} Jesus Diaz Nunez was arrested on April 7, 1995, and, on May 9, 1995, was charged with possession of marijuana with intent to sell. On April 10, 1995, a complaint for forfeiture was filed against Nunez's 1981 Ford Crown Victoria, in which he was allegedly transporting the marijuana. Nunez was indigent and was unable to obtain legal representation to contest the forfeiture. He did not appear at the forfeiture hearing and a default judgment was entered in May 1995. *See State ex rel. Department of Pub. Safety v. One 1981 Ford Crown Victoria*, No. SF–95–789(c) (N.M.Dist.Ct. May 25, 1995) (Default Judgment).

{4} Nunez, through a public defender, on August 18, 1995, filed a motion to dismiss the criminal charges based upon the violation of the Double Jeopardy Clauses of the United States and New Mexico Constitutions. The court determined that the forfeiture was penal in nature and that "[s]ince the State elected to obtain forfeiture before seeking criminal punishment, the State cannot now seek a second punishment in a criminal proceeding; and, therefore, defendant's motion should be granted." *See State v. Nunez*, No. CR–95–128–S (N.M.Dist.Ct. Aug. 28, 1995) (Order to Dismiss). The State appeals, and we affirm.

### B. State v. Chavez

{5} David Michael Chavez was arrested on June 20, 1994, for possession of drug paraphernalia and possession of marijuana with intent to distribute. The police seized $3268 in currency from his home. On July 7, 1994, Chavez was again arrested for possession of marijuana with intent to distribute. The Albuquerque Police Department (APD) police seized a 1986 Chevrolet van, which was allegedly used to transport the marijuana, $50 in currency found in the vehicle, and $300 in currency found in Chavez's home.

{6} On July 19, 1994, the APD filed a petition of forfeiture against the $3268 seized in June and, on August 8, 1994, filed a petition of forfeiture against the vehicle and $350 seized in July. Chavez filed answers to the petitions in which he asserted that he was the owner of the vehicle and currency seized by the police. Half a year after the forfeiture petitions were filed, criminal charges for the two arrests were filed against Chavez on February 9, 1995.

{7} In March 1995, Chavez and the APD arrived at two compromise settlements regarding the seized property. Regarding the vehicle and currency seized in July 1994, a judgment was entered in which the APD kept the $350 and the van was returned to Chavez. *See State ex rel. Albuquerque Police Dep't v. One 1986 Chevrolet Blue and White Van*, No. MS 94–162 (N.M.Dist.Ct. Mar. 6, 1995) (Judgment of Forfeiture). As to the $3268 seized in June 1994, a judgment was entered in which the APD kept $2179 and $1089 was returned to Chavez. *See State ex rel. Albuquerque Police Dep't v. Three Thousand Two Hundred Sixty Eight Dollars*, No. MS 94–147 (N.M.Dist.Ct. Mar. 9, 1995) (Judgment of Forfeiture).

{8} A few days after the forfeiture settlements, on March 13, 1995, Chavez filed a motion to dismiss the criminal charges. He argued that the State had punished him once by forfeiting his property and was therefore barred by principles of double jeopardy from punishing him a second time in the criminal proceedings. The trial court granted the motion to dismiss. *See State v. Chavez*, No. CR–95–312 (N.M.Dist.Ct. May 5, 1995) (Order re: Motion to Dismiss for Double Jeopardy). The State appeals, and we affirm.

### C. State v. Gallegos

{9} Alex Gallegos was arrested for possession of cocaine on September 1, 1994.

The police seized $299 found under his mattress. Gallegos testified that he was employed by a construction company and the money was the remainder of his paycheck which he had cashed earlier on the day of the arrest. The police testified that they asked Gallegos for proof, such as a pay stub or a letter from his employer, that the money was from a paycheck but that such proof was never provided. A forfeiture complaint was filed against the $299 on October 3, 1994. Gallegos, hoping to recover the money, sought the help of an attorney who told him that the legal fees for handling such a matter would cost far more than $299. Gallegos concluded he had no choice but to let the money go. A default judgment was entered on May 4, 1995, when Gallegos failed to appear to contest the forfeiture. *See State ex rel. Albuquerque Police Dep't v. Two Hundred Ninety Nine Dollars*, No. MS 94–00214 (N.M.Dist.Ct. May 4, 1995) (Default Judgment).

{10} Criminal charges were filed against Gallegos on April 27, 1995. He moved, on October 16, 1995, to dismiss the criminal charges on double-jeopardy grounds. This motion was denied. *See State v. Gallegos*, No. CR–95–1108 (N.M.Dist.Ct. Feb. 14, 1996) (Order). Gallegos pleaded guilty to possession of cocaine on February 28, 1996, and a judgment was filed in May 1996. *See State v. Gallegos*, No. CR–95–1108 (N.M.Dist.Ct. May 17, 1996) (Judgment, Sentence and Order Suspending Sentence). He now appeals his criminal conviction on double-jeopardy grounds, and we reverse.

### D. *State v. Edward Vasquez* and *State v. Marguerite Vasquez*

{11} Edward and Marguerite Vasquez, husband and wife, were arrested on August 25, 1995, at a border patrol checkpoint. In October of 1995, they were charged with possession of cocaine with intent to distribute, conspiracy to distribute cocaine, possession of marijuana with intent to distribute, and conspiracy to distribute marijuana. The police seized a 1983 Ford Fairmont that was allegedly used to transport the drugs, $40 that was in Edward's possession, and $39 that was in Marguerite's possession. A peti-

tion of forfeiture against the vehicle and currency was filed on September 8, 1995. When the Vasquezes failed to appear to contest the forfeiture, a default judgment was entered on November 14, 1995. *See In re Forfeiture of a White 1983 Ford Fairmont*, No. CV–95–315 (N.M.Dist.Ct. Nov. 14, 1995) (Default Judgment of Forfeiture).

{12} In response to the narcotics charges on March 7, 1996, Edward filed a pre-trial motion to dismiss in which Marguerite claims to have joined, arguing that, because they had already been penalized by the forfeiture, double jeopardy prevented further prosecution. The trial court denied the motion, apparently at a hearing on March 12, 1996. Edward and Marguerite, in a single trial, were convicted on all counts by a jury on March 15, 1996. *See State v. Vasquez*, No. CR–95–383 (N.M.Dist.Ct. Mar. 21, 1996) (Judgment and Sentence). They now appeal their criminal convictions on double-jeopardy grounds, and we reverse.

## II. NEW MEXICO AND THE FEDERAL CONSTITUTION

{13} It is settled law in New Mexico that "[w]e are not bound to give the same meaning to the New Mexico Constitution as the United States Supreme Court places upon the United States Constitution, even in construing provisions having wording that is identical, or substantially so, 'unless such interpretations purport to restrict the liberties guaranteed the entire citizenry under the federal charter.'" *State ex rel. Serna v. Hodges*, 89 N.M. 351, 356, 552 P.2d 787, 792 (1976) (quoting *People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099, 1112 (1975)), *overruled on other grounds by State v. Rondeau*, 89 N.M. 408, 412, 553 P.2d 688, 692 (1976). Moreover, "when this Court derives an interpretation of New Mexico law from a federal opinion, our decision remains the law of New Mexico even if federal doctrine should later change." *State v. Breit*, 1996–NMSC–067, ¶ 27, 122 N.M. 655, 930 P.2d 792. The United States Supreme Court has recognized the rights of states, under their own law, to depart from federal interpretations.[1]

{14} New Mexico interprets its State Constitution using the interstitial approach. As we explained in *State v. Gomez,*

Under the interstitial approach, the court asks first whether the right being asserted is protected under the federal constitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined. A state court adopting this approach may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics.

1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1 (citation omitted).

{15} Thus, the first step in the *Gomez* analysis is a determination of whether the United States Constitution protects the right in question. As a matter of principle, we prefer to interpret our State Constitution in conformity with federal doctrine. "[W]e recognize the value of uniformity in the advancement and application of the rights guaranteed by both our state and federal constitutions ." *Breit,* 1996–NMSC–067, ¶ 27, 122 N.M. 655, 930 P.2d 792,. An effective federalist system depends upon a significant measure of cooperation and consistency between state and federal governments. *See State v. Hunt,* 91 N.J. 338, 450 A.2d 952, 964 (N.J. 1982) (Handler, J., concurring). This is why, under *Gomez,* we will not invoke the State Constitution unless a constitutional right is not protected under federal law. *Gomez,* 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1. If it is not, then under the second step of the *Gomez* analysis, we inquire whether our jurisprudence is distinctive, whether there are differences in our system of governance, or whether federal doctrine is wanting. We have not hesitated, when any of these three circumstances have been present, to conclude that the New Mexico Constitution provides greater protection of individual rights than does the federal constitution.[2]

{16} In our opinion today, we reject federal doctrine regarding the double-jeopardy implications of civil forfeiture as it is applied under the Controlled Substances Act. In 1996, the United States Supreme Court, in a singular reversal of its recent double-jeop-

ardy jurisprudence, issued *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). In *Ursery,* the Supreme Court held that "[i]n rem civil forfeitures are neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause." *Ursery,* 518 U.S. at 292, 116 S.Ct. 2135. The Court thus—in the realm of controlled-substance-related forfeitures, and in essentially every other type of civil forfeiture—eliminated any double-jeopardy ground for dismissing civil forfeiture cases under the United States Constitution. Many articles and cases have meticulously summarized, criticized, and applied *Ursery.* We will not replicate this oft-repeated information except to describe aspects of *Ursery* that are distinct from established New Mexico law. We conclude, under the first part of the *Gomez* analysis, that, after *Ursery,* the federal constitution does not prevent the State from bringing, under the Controlled Substances Act, separate criminal and civil forfeiture actions for the same offense. The rights asserted by the defendants before us are not protected under federal law.

{17} Under the second part of the *Gomez* analysis, we justify our departure from federal constitutional doctrine because of the distinctive characteristics of New Mexico's double-jeopardy and forfeiture jurisprudence.[3] *See Gomez,* 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1. As we demonstrate in detail below, New Mexico has a time-honored precedent that has always regarded forfeiture as punitive. Moreover, the New Mexico and federal double-jeopardy protections are facially different and, recently, our double-jeopardy case law has departed from the federal standard. As the many New Mexico cases cited in this opinion demonstrate, were we to follow *Ursery,* we would be in conflict with, and would be required to dismantle, a significant body of settled law, much of which was decided independently of federal case law.[4]

{18} We emphasize that our opinion today is founded entirely and exclusively on the New Mexico State Constitution. We cite to federal jurisprudence, not on its own authority, but solely on the basis of the strength of its argument. Much of this opinion is devot-

ed to distinguishing federal law from New Mexico law. When we refer with approval to federal cases, we do so because, in our view, they provide a truthful statement of matters we decide entirely under the New Mexico Constitution. New Mexico law is the sole authority upon which we base our decision today.

## III. RELEVANT FORFEITURE LAWS

{19} The Controlled Substances Act defines controlled substances, empowers the Board of Pharmacy to administer and regulate their manufacture, distribution, and dispensation, and establishes penalties for the illegal trafficking of controlled substances. Pertinent to this case are the Act's provisions for civil forfeiture, NMSA 1978, §§ 30–31–34 to –37 (1972, as amended through 1989).

{20} The types of property that may be forfeited are listed in NMSA 1978, § 30–31–34 (1989):

The following are subject to forfeiture:

A. all controlled substances and all controlled substance analogs which have been manufactured, distributed, dispensed or acquired in violation of the Controlled Substances Act;

B. all raw materials, products and equipment of any kind including firearms which are used or intended for use in manufacturing, compounding, processing, delivering, importing or exporting any controlled substance or controlled substance analog in violation of the Controlled Substances Act;

C. all property which is used or intended for use as a container for property described in Subsection A or B of this section;

D. *all conveyances, including* aircraft, *vehicles* or vessels, which are used or intended for use to transport or in any manner to facilitate the transportation for the purpose of sale of property described in Subsection A or B of this section;

E. all books, records and research products and materials, including formulas, microfilm, tapes and data, which are used or intended for use in violation of the Controlled Substances Act;

F. narcotics paraphernalia or *money which is a fruit or instrumentality of the crime;*

. . . .

H. all drug paraphernalia as defined [in subsection (V) of the "Definitions" section of the Act, NMSA 1978, § 30–31–2 (1997) ].

(Emphasis added.) The forfeitures of the various automobiles and trucks in these consolidated cases were carried out under the auspices of Subsection D of this statute. The cash forfeitures were authorized by Subsection F. Several of the remaining provisions of this statute regulated the forfeiture of the controlled substances, contraband, and instrumentalities that gave rise to the various criminal prosecutions in these cases.

{21} The Act specifies that the judicial forfeiture proceeding is civil rather than criminal:

In the event of seizure pursuant to [a court order or under specific circumstances that do not require a court order], proceedings under ... the Rules of Civil Procedure for the District Courts of New Mexico shall be instituted promptly and not later than thirty days after seizure.

NMSA 1978, § 30–31–35(C) (1981).

{22} The New Mexico forfeiture statute includes innocent-owner provisions that protect property from forfeiture when the violation of the Controlled Substances Act was committed without the owner's "knowledge or consent." Section 30–31–34(G)(1), (2), (4). We shall address below the double-jeopardy significance of these provisions. We will also address the statutory provision that places the burden of proof in a forfeiture action, not on the State to prove that the property was used in a crime, but on the defendant to prove that it was not. *See* NMSA 1978, § 30–31–37 (1972). The forfeiture laws also provide for the disposition of forfeited property, and we shall mention the implications behind the fact that law enforcement agencies may benefit from the proceeds of forfeitures. *See* § 30–31–35(E).

{23} The holding by the United States Supreme Court in *Ursery* that double jeopardy is not implicated by civil forfeitures under

18 U.S.C. § 981(a)(1)(A) (1994), and 21 U.S.C. § 881(a)(6) & (a)(7) (1994 & Supp. II 1996), applies to the double-jeopardy analysis of our Section 30–31–34 only for purposes of the United States Constitution. *See Ursery,* 518 U.S. at 291–92, 116 S.Ct. 2135. However, unless this Court determines otherwise, *Ursery* has no authority when our forfeiture laws are viewed in light of the New Mexico Constitution.

## IV. DOUBLE JEOPARDY

### A. The Double Jeopardy Clause

{24} The New Mexico Double Jeopardy Clause differs from its federal counterpart. The Fifth Amendment to the United States Constitution states simply, "No person shall ... be subject for the same offense to be twice put in jeopardy of life or limb ...." U.S. Const. amend. V. New Mexico specifies double-jeopardy protections that are only implicit in the federal version:

> No person shall ... be twice put in jeopardy for the same offense; and when the indictment, information or affidavit upon which any person is convicted charges different offenses or different degrees of the same offense and a new trial is granted the accused, he [or she] may not again be tried for an offense or degree of the offense greater than the one of which he [or she] was convicted.

N.M. Const. art. II, § 15.

{25} This constitutional protection is reiterated and expanded by our double-jeopardy statute:

> No person shall be twice put in jeopardy for the same crime. *The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment.* When the indictment, information or complaint charges different crimes or different degrees of the same crime and a new trial is granted the accused, he [or she] may not again be tried for a crime or degree of the crime greater than the one of which he [or she] was originally convicted.

Section 30–1–10 (emphasis added). The nonwaiver provision is especially significant because federal case law expressly denies a similar interpretation of the Fifth Amendment.[5]

{26} In times past we regarded our State Constitution's Double Jeopardy Clause as being "subject to the same construction and interpretation as its counterpart in the Fifth Amendment to the United States Constitution." *State v. Day,* 94 N.M. 753, 756, 617 P.2d 142, 145 (1980); *accord Swafford v. State,* 112 N.M. 3, 7 n. 3, 810 P.2d 1223, 1227 n. 3 (1991) (finding no suggestion "that the New Mexico double jeopardy clause, in the multiple punishment context, provides further protection than that afforded by the federal clause as interpreted by relevant federal case law"). However, with *State v. Breit,* in keeping with our interstitial relationship with the Federal Constitution, we parted ways with the United States Supreme Court's views of the Fifth Amendment. In *Breit,* we held that the Double Jeopardy Clause of the New Mexico Constitution barred retrial following a mistrial caused by prosecutorial misconduct, when the prosecutor knew his or her conduct was improper and prejudicial, and either intended to provoke a mistrial or acted in willful disregard of the resulting mistrial, retrial, or reversal. *Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. We concluded that the reasoning of *Oregon v. Kennedy,* 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), was flawed because it barred retrial only if the prosecutor intended to provoke a mistrial. *See Breit,* 1996–NMSC–067, ¶¶ 19–24, 122 N.M. 655, 930 P.2d 792.

{27} When compared to recent United States Supreme Court Fifth–Amendment jurisprudence, New Mexico's constitutional and statutory protection against double jeopardy, on its face, is of a different nature, more encompassing and inviolate.

### B. The Moments When Jeopardy Attaches

{28} Civil and criminal proceedings each have different moments of attachment. In a criminal trial, jeopardy attaches at the moment the trier of fact is empowered to make any determination regarding the

defendant's innocence or guilt. *See State v. Davis*, 1998–NMCA–148, ¶ 14, 126 N.M. 297, 968 P.2d 808. In a nonjury trial, this means that jeopardy attaches when the court begins to hear at least some evidence on behalf of the state.[6] In a jury trial, jeopardy attaches at the point when a jury is impaneled and sworn to try the case. *State v. James*, 93 N.M. 605, 606, 603 P.2d 715, 716 (1979). In the case of a guilty plea or plea of nolo contendere, jeopardy attaches at the time the court accepts the defendant's plea. *See State v. James*, 94 N.M. 7, 9, 606 P.2d 1101, 1103 (Ct.App.) (guilty), *rev'd on other grounds*, 93 N.M. 605, 603 P.2d 715 (1979); *State v. Degnan*, 587 A.2d 71, 72 (R.I.1991) (nolo). We will explain below why double jeopardy is not waived by a guilty plea.

{29} In civil forfeiture proceedings, many authorities have suggested that jeopardy attaches at the time the court enters its final judgment.[7] This is because the final decree of forfeiture marks the moment when the ownership rights of the defendant are altered. Thus, as we shall explain below, even if there was no trial because the defendant did not appear at the forfeiture hearing, jeopardy attaches upon the issuance of a default judgment order. We hold that jeopardy attaches in a civil forfeiture proceeding at the time the court enters its final judgment, either at the conclusion of a trial or upon entering a default judgment.

{30} The protection against multiple prosecutions of the same offense is not dependent upon whether jeopardy first attached in the criminal or the civil proceeding. Whatever the sequence, the New Mexico Double Jeopardy Clause forbids the prosecution of the same infraction in two separate proceedings. *See Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 804, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (Scalia, J., dissenting) ("[I]f there is a constitutional prohibition on multiple punishments, the order of punishment cannot possibly make any difference."). The New Mexico Constitution bars whichever action placed the defendant in jeopardy a second time for the same offense.

{31} In cases like those we address today, if the civil forfeiture is pursued first, resulting in either a trial or a default judgment, the double-jeopardy defense would arise upon the subsequent initiation of a criminal proceeding. Conversely, if the defendant is first subjected to a criminal prosecution, the double-jeopardy defense would be triggered at the moment the state commenced a subsequent forfeiture action.

## V. FORFEITURE DEFINED

{32} In the New Mexico Constitution, the ownership of property is as meaningful and fundamental as the rights to life, safety, and happiness:

All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness.

N.M. Const. art. II, § 4.

{33} Forfeiture is the complete divestiture of the ownership of property without compensation. *See* Black's Law Dictionary 661 (7th ed.1999). Thus, it extinguishes one of the most fundamental liberty interests. Mary M. Cheh, *Can Something This Easy, Quick, and Profitable Also Be Fair? Runaway Civil Forfeiture Stumbles on the Constitution*, 39 N.Y.L. Sch. L.Rev. 1, 10 (1994) [hereinafter Cheh, *Easy* ]. It is a statutorily created sanction for the commission of certain illegal acts or for the breach of certain obligations or conditions. *See* Black's Law Dictionary 661.

{34} Forfeiture, as a means of combating the trafficking of controlled substances, is based on the principle that people who commit crimes must not profit from their wrongdoing.

Modern forfeiture is justified as a means of taking the profit out of crime and as a device to destroy criminal "enterprises," that is, any business, association, cartel, or concerted action that tends to continue operating even if involved individuals are jailed. These are laudable objectives that appeal to good common sense and elementary principles of morality. It is the essence of justice to deprive a criminal of his

booty and to destroy what are, in effect, nests of criminal activity.

Cheh, *Easy, supra*, at 5–6 (footnote omitted). Thus, ideally, forfeitures under the Controlled Substances Act discourage illegal economies and divest criminals of the profits of the drug trade.

{35} Civil forfeiture is often analyzed as the confiscation of three different types of property: First is *contraband*, which is anything that, by law, "cannot be possessed at all or possessed only under strict conditions," such as contaminated or misbranded products, controlled substances, unlawfully possessed firearms, counterfeit money, stolen property, and vehicles with false identification numbers.[8] Second are *proceeds*, which are the monetary profits derived from an illegal enterprise as well as any goods or investments purchased with that money. *See* Rachel L. Brand, *Recent Developments*, 20 Harv. J.L. & Pub. Pol'y 292, 306 (1996). Third are *instrumentalities*, which are property used in committing a crime—they are integral to the crime, the means without which the crime could not have been committed as charged, the sine qua non of trafficking in controlled substances. In New Mexico, under the Controlled Substances Act, contraband is summarily forfeited by the State. *See* NMSA 1978, § 30–31–36 (1987). Summary forfeiture of contraband does not implicate double jeopardy. Contraband is property that is illegal in itself, regardless of how it was acquired, how it was used, whether or not anyone even owns it. No one has the right, under Article II, Section 4 of our Constitution, to acquire, possess, or protect contraband. However, in the forfeiture of all other types of property under the Controlled Substances Act, jeopardy attaches.

## VI. THE NEW MEXICO MULTIPLE PROSECUTIONS TEST

### A. The Three–Part Test From *Schwartz* and the Two–Part Test from *Ursery*

{36} Among the distinctive state characteristics in New Mexico's double-jeopardy jurisprudence is the three-pronged "[m]ultiple punishment analysis" described in *State ex rel. Schwartz v. Kennedy:*

Multiple punishment analysis ... entails three factors: (1) whether the State subjected the defendant to separate proceedings; (2) whether the conduct precipitating the separate proceedings consisted of one offense or two offenses; and (3) whether the penalties in each of the proceedings may be considered "punishment" for the purposes of the Double Jeopardy Clause.

120 N.M. 619, 626, 904 P.2d 1044, 1051 (1995).

{37} In contrast, the *Ursery* majority justified its conclusion by applying a two-pronged test. *Ursery*, 518 U.S. at 277–78, 116 S.Ct. 2135. The *Ursery* court quoted that test from one of its earlier forfeiture cases: *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), *superceded on other grounds by statute as noted by Cooper v. City of Greenwood*, 904 F.2d 302, 305 n. 3 (5th Cir.1990). This two-pronged test is supposed to determine whether a forfeiture statute was intended by Congress to be punitive or remedial.

First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.

*89 Firearms*, 465 U.S. at 362–63, 104 S.Ct. 1099 (quoting *United States v. Ward*, 448 U.S. 242, 248–49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)) (citation omitted), *quoted in part in Ursery*, 518 U.S. at 277–78, 116 S.Ct. 2135.

{38} The most obvious distinction between these two tests is that *Schwartz* includes two factors left unexpressed by *Ursery* that, to us, seem indispensable in evaluating a multiple prosecution double-jeopardy claim: whether there were "separate proceedings" and whether the proceedings were directed at only "one offense." By discounting these considerations, the *Ursery* Court avoids addressing whether the cases in question are multiple punish-

ment or multiple prosecution cases. If we conclude, under *Schwartz,* that these are separate proceedings seeking separate punishments for a single offense, there is no question that the prohibition against multiple prosecutions has been violated. The most conservative members of the United States Supreme Court have admitted that, even if the double-jeopardy clause does not reach multiple punishments, it does protect against multiple prosecutions. *See, e.g., Ursery,* 518 U.S. at 297, 116 S.Ct. 2135 (Scalia, J., concurring).

{39} However, of greater significance is the almost complete reliance by the two-part *Ursery/89 Firearms* test on the legislative determination to label a particular sanction "civil" or "criminal." The first question the Court asks is "whether Congress intended proceedings under 21 U.S.C. § 881, and 18 U.S.C. § 981, to be criminal or civil." *Ursery,* 518 U.S. at 288, 116 S.Ct. 2135. In implementing this first prong, the *Ursery* Court found that "[t]here is little doubt that Congress intended these forfeitures to be civil proceedings," because Congress designed forfeiture under the statute to be *in rem,* impersonally "targeting the property itself." *Id.* at 288–89, 116 S.Ct. 2135. The Court also noted that federal forfeitures are governed by civil procedure mechanisms rather than criminal procedure mechanisms. *Id.* at 289, 116 S.Ct. 2135. We shall respond to these in rem and civil/criminal arguments below.

{40} In the second stage of the analysis, the Court evoked the declaration of *89 Firearms,* that, " ' "[o]nly the clearest proof" ' that the purpose and effect of the forfeiture are punitive will suffice to override Congress' manifest preference for a civil sanction." *89 Firearms,* 465 U.S. at 365, 104 S.Ct. 1099 (quoting *Ward,* 448 U.S. at 249, 100 S.Ct. 2636 (quoting *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960))). The Court found that the federal forfeiture statutes, "while perhaps having certain punitive aspects, serve important nonpunitive goals." *Ursery,* 518 U.S. at 290, 116 S.Ct. 2135. The second question is structured to further reinforce the Court's complete deference to legislative intent.

This prong asks whether the forfeiture proceedings "are so punitive in form and effect as to render them criminal despite Congress' intent to the contrary." *Id.* An affirmative answer to this question depends upon a very high standard—"clearest proof"—which guarantees that legislative intent will prevail except in the most egregiously punitive circumstances. *See id.;* Adam C. Wells, Comment, *Multiple–Punishment & the Double Jeopardy Clause: The United States v. Ursery Decision,* 71 St. John's L.Rev. 153, 170 (1997). In the context of all the other arguments of *Ursery,* "clearest proof" is such an inaccessible standard that it requires the judiciary to suspend its own interpretation of the constitution in favor of that of the legislature.[9] Unlike federal courts, New Mexico courts have never used the expression "clearest proof" as a standard for evaluating the legitimacy of forfeiture actions.

{41} Commentators—including those courts that have followed *Ursery*—almost universally interpret *Ursery* to justify the abrogation of any double-jeopardy protection in civil forfeiture actions.[10] *Ursery* states explicitly that its holding applies to "civil forfeitures generally." *Ursery,* 518 U.S. at 270, 116 S.Ct. 2135. It is difficult to imagine a forfeiture scenario that would be so punitive as to surpass the bar set by *Ursery.*

{42} We have discovered only two cases—only one of which deals with forfeiture—that held, under the *Ursery* "clearest proof" standard, that a sanction was punitive for double jeopardy purposes. In *State v. Klein,* 702 N.E.2d 771, 772 (Ind.Ct.App. 1998), *transfer denied,* 719 N.E.2d 386 (1999) (Sullivan, J., dissenting to transfer denial), the defendant was prosecuted for various crimes in relation to an accusation of sexual assault. Under an Indiana statute that authorized the seizure of property that had been used in the commission of certain enumerated crimes, the state forfeited his vehicle, claiming it had been used to escape. *Id.* The Indiana Court of Appeals applied the two-part *Ursery* test and found that because forfeiture of the vehicle was stipulated by the relevant statute as a sanction for the specific crimes of attempted rape and criminal confinement, double jeopardy prevented further

prosecution for those crimes after the forfeiture had taken place. However, the charges of attempted criminal deviate conduct and criminal deviate conduct were not barred by double jeopardy because those crimes were not among the enumerated offenses in the forfeiture statute. *Id.* at 773–75.

{43} The non-forfeiture case, *People v. Wood*, 260 A.D.2d 102, 698 N.Y.S.2d 122, 124–27 (1999), mentioned *Ursery* and held that double jeopardy prevented a criminal contempt proceeding for harassment after the defendant had already been sanctioned in a family-court contempt proceeding based on same underlying conduct. The court in *Wood* could hardly dispute that the defendant had already been punished because the sanction under the first proceeding was a jail sentence.

{44} Even if there are other cases like these, they are all solitary exceptions to the otherwise universal impact of the two-part *Ursery* test: the abrogation of any double-jeopardy protection when a civil forfeiture and a criminal prosecution are brought for the same offense. As we demonstrate below, we would have to discard a significant body of established New Mexico law if we were to construe so narrowly our own Double Jeopardy Clause.

## B. New Mexico's Doctrine Regarding Deference to Legislative Intent

{45} The immediate virtue of the *Schwartz* test over the *Ursery/89 Firearms* two-part test is that there is no deference to legislative intent regarding the determination of fundamental constitutional rights. The congressional decision to describe forfeiture as a civil proceeding is one of the main arguments the *Ursery* Court depends upon to support its conclusion that forfeitures are not punishment. *See Ursery*, 518 U.S. at 288–89, 116 S.Ct. 2135.

{46} The Controlled Substances Act explicitly declares that forfeiture shall be instituted under "the Rules of Civil Procedure for the District Courts of New Mexico." Section 30–31–35(C). However, in New Mexico, the fact that the Legislature has chosen to label a proceeding "civil" or "criminal" is not dispositive of the true nature of that proceeding.

We settled this matter in *State ex rel. Schwartz v. Kennedy*. In that case we concluded that if the penalty in a civil proceeding "may be fairly characterized only as a deterrent or as retribution, then the revocation is punishment; if the penalty may be fairly characterized as remedial, then it is not punishment for the purposes of double jeopardy analysis." *Schwartz*, 120 N.M. at 630, 904 P.2d at 1055; *accord New Mexico Taxation & Revenue Dep't v. Whitener*, 117 N.M. 130, 133, 869 P.2d 829, 832 (Ct.App.1993) (discussing with approval the holding of *United States v. Halper*, 490 U.S. 435, 447–48, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), *abrogated by Hudson v. United States*, 522 U.S. 93, 95, 100–03, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), that "the labels 'criminal' and 'civil' were not of paramount importance and could not be utilized to defeat the applicable protections of constitutional law"). The resolution of the issue before us turns, not on the fact that a forfeiture proceeding is instituted under the rules of civil procedure, but on whether the sanction of forfeiture was intended to be a form of punishment. *See Whitener*, 117 N.M. at 134, 869 P.2d at 833 (stating that "the most relevant consideration was the character of the sanction and whether it could fairly be called punitive in nature").

{47} The *Ursery* Court's willingness to cede to Congress so much of its control over fundamental constitutional protections is contrary to New Mexico law. *See* Susan R. Klein, *Redrawing the Criminal–Civil Boundary*, 2 Buff.Crim. L.Rev. 679, 683 (1999) (The United States Supreme Court "now routinely blesses whatever label a legislature places on a sanction."). Our Court of Appeals has expressed disapproval for such an approach, stating that, in New Mexico, "[t]he State cannot restrict an individual's constitutional rights by statute." *Whitener*, 117 N.M. at 134, 869 P.2d at 833; *accord State v. Barber*, 108 N.M. 709, 710–11, 778 P.2d 456, 457–58 (Ct.App.1989) (legislature cannot diminish a right expressly guaranteed by the constitution). "If an action by the government violates a constitutional prohibition, no amount of evidence manifesting the legislature's purportedly benign intent in au-

thorizing that action can render the action constitutional." *In re P.S.*, 175 Ill.2d 79, 221 Ill.Dec. 853, 676 N.E.2d 656, 663 (1997) (Heiple, C.J., dissenting).

{48} It is the role of the judiciary, and not the legislature, to interpret the constitution. The mere fact that the legislature has chosen to affix to a statute the appellations "civil" or "criminal" does not sanctify the deprivation of constitutional rights that are guaranteed to all criminal defendants. Most emphatically, legislative intent should not be considered determinative of multiple prosecution cases. Legislative intent, no matter how well meaning, cannot bestow constitutional legitimacy upon the imposition of multiple punishments in multiple proceedings for a single offense. Legislators, in choosing whether to describe a sanction as "civil" or "criminal," will naturally seek to minimize the likelihood of judicial scrutiny. *Cf.* Andrew J. Gottman, Note, *Fair Notice, Even for Terrorists: Timothy McVeigh and a New Standard for the ex Post Facto Clause*, 56 Wash. & Lee L.Rev. 591, 645 (1999) ("No rational Congress would ever place a criminal label on a retrospective bill."). The New Mexico Double Jeopardy Clause may not be circumvented simply because the Legislature has labeled one of two sanctions as "civil."

{49} To be sure, in a *single* proceeding, the New Mexico Double Jeopardy Clause does not prevent the Legislature from authorizing multiple punishments for the same offense.[11] In that circumstance we do defer because it is the role of the Legislature to define crimes and ascribe the proper punishments. *See State v. Tsethlikai*, 109 N.M. 371, 373, 785 P.2d 282, 284 (Ct.App.1989) ("When conduct by a defendant violates two statutory provisions, the role of the constitutional guaranty is limited to assuring that the sentencing court has not exceeded its legislative authority."). There are, of course, limitations on this legislative power. *See Swafford*, 112 N.M. at 13–14, 810 P.2d at 1233–34 (setting forth "a two-part test for determining legislative intent to punish").

## C. *Schwartz* Distinguished

{50} The issues we addressed in *Schwartz* differ from the issues we address today. *Schwartz* concerned an administrative sanction rather than a nominally civil forfeiture. Specifically, *Schwartz* addressed "whether double jeopardy prohibits the State from subjecting an accused drunk driver to both an administrative driver's license revocation proceeding and a criminal prosecution." *Schwartz*, 120 N.M. at 623, 904 P.2d at 1048. In applying our three-part test, we concluded that the State had subjected the DWI defendants to separate proceedings and that the conduct precipitating the separate proceedings consisted of a single offense. *Id.* at 626–28, 904 P.2d at 1051–53. However, as to the third part of the test, we concluded that the administrative license revocation was not punishment for double-jeopardy purposes.

{51} In making this determination we followed the United States Supreme Court's holding in *Halper*, 490 U.S. at 447, 109 S.Ct. 1892, that the legislative choice to apply the labels "criminal" or "civil" are not determinative of whether a particular sanction is punitive. *Schwartz*, 120 N.M. at 628–29, 904 P.2d at 1053–54. In *Schwartz* we held that "[i]n order to ascertain whether these sanctions are punitive we must look at the purposes that the sanctions actually serve. We make this determination by evaluating the government's purpose in enacting the legislation, rather than evaluating the effect of the sanction on the defendant." *Id.* at 631, 904 P.2d at 1056 (citation omitted). Looking at the purposes behind the administrative revocation of a driver's license, we concluded that it is "significant that the operation of automobiles on public highways is an activity that is regulated by the government." *Id.* An essential aspect of government regulation is issuing of licenses that are conditional; they are valid only as long as the participant adheres to the standards "set by the government for participation in a regulated activity." *Id.* Upon a violation, the administrative sanction is not punitive if it "reasonably serves regulatory goals adopted in the public interest." *Id.* Though we found that the license revocation did have certain punitive

aspects, we concluded that the primary objectives of the sanction were predominately remedial. *Id.* at 633–34, 904 P.2d at 1058–59. We held that suspending a driver's license for DWI "serves the legitimate nonpunitive purpose of protecting the public from the dangers presented by drunk drivers and helps enforce regulatory compliance with the laws governing the licensed activity of driving." *Id.* at 632, 904 P.2d at 1057.

{52} In contrast, the statutes applicable to the cases we address today do not concern a regulated lawful activity, but rather an illegal criminal activity. Trafficking in controlled substances is not a government-granted privilege that is taken away by the sanction of forfeiture. As we explain in detail below, forfeitures under Section 30–31–34 were not designed—and indeed could never be designed—to serve the remedial objective of compensating the government or society for the incalculable costs of the illegal drug trade. Forfeiture inflicts a pecuniary penalty as punishment for the crime and seeks to deter any recurrence of the crime. Applying the logic of *Schwartz,* even though forfeiture has some remedial aspects, the design and motives behind the forfeiture statutes are unquestionably punitive. The forfeitures in the cases at hand are distinct from the administrative sanction discussed in *Schwartz* because their purposes and intentions are primarily punitive.

{53} The *Schwartz* test set forth New Mexico's distinctive method for evaluating possible violations of the protections against multiple prosecutions and multiple punishments. Even though the *Schwartz* test was directed at administrative license revocation rather than civil forfeiture, we find it to be entirely adaptable to the cases we address today. A measure of the dispassionate nature of the three-part *Schwartz* test is that it is conducive, on the one hand, of the holding in *Schwartz* that administrative revocations are not punitive, and on the other hand, of our holding today that forfeitures under the Controlled Substances Act are punitive. The two-part *Ursery/89 Firearms* test would be an unnecessary departure from New Mexico law.

{54} The rights asserted by the defendants in the cases before us today are not protected by the federal test. Following *Gomez,* we therefore will examine whether there is protection under the New Mexico test. *See Gomez,* 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1. We now apply the three-pronged *Schwartz* test.

## VII. SEPARATE PROCEEDINGS

{55} Applying the first prong of the *Schwartz* test, there is no dispute that, under current New Mexico law, the criminal prosecution and the forfeiture action are separate proceedings. We certainly reject any attempt to contrive an identity between the two proceedings such as that set forth in *United States v. Millan,* 2 F.3d 17, 20 (2d Cir.1993), in which the court asserted that the two actions were both were part of a "single, coordinated prosecution." If there were only one proceeding, these cases would not be before us.

## VIII. ONE OFFENSE

{56} The second factor in the *Schwartz* test—whether the conduct at issue consists of one or more than one offense—is more complex. Because two different bodies of law are applied—drug trafficking laws and forfeiture laws—we must determine whether each statute punishes different conduct or both apply to the same conduct. Most courts, if they address this question, answer it by invoking the well-worn *Blockburger* test which states that when "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The *Blockburger* test has been augmented by our courts and is integral to New Mexico's double-jeopardy jurisprudence. *See Swafford,* 112 N.M. at 8–9, 810 P.2d at 1228–29 (incorporating *Blockburger* into New Mexico test for analyzing multiple punishment claims); *Schwartz,* 120 N.M. at 626–27, 904 P.2d at 1051–52 (applying *Blockburger* in determining "whether the conduct precipitating

the revocation hearing and the criminal prosecution consists of one offense or two offenses").

{57} We conclude that an examination of the Controlled Substances Act reveals that there is no fact needed to prove the drug trafficking violation that is not also needed to prove the grounds for forfeiture. All the forfeitures of property under Section 30–31–34 are expressly predicated on the fact that the defendant was "in violation of the Controlled Substances Act." The forfeiture statute entirely subsumes the criminal offense.

{58} This interpretation is further supported by the innocent owner provisions that limit the application of the forfeiture statute exclusively to those who are in "violation of the Controlled Substances Act." *See* § 30–31–34(G)(1), (2), (4). By making an exception for innocent owners the Legislature could only have intended the criminal offense to be an element necessary to justify the civil forfeiture action.

{59} Therefore, in the case of forfeitures under the Controlled Substances Act, we hereby establish a presumption that when a forfeiture action and a criminal action are directed at the same defendant and rely on the same general evidence, then both proceedings concern the same offense. The State will bear the burden of proving otherwise. Specifically, the State will have to prove with clear and convincing evidence that the criminal action and forfeiture action are unquestionably directed at completely distinct and unrelated offenses.

{60} We establish this presumption in favor of defendants because they should be protected from an unfair partitioning of their offenses. When there is more than one count of trafficking in controlled substances, the State is forbidden from instituting a criminal action on some counts and a forfeiture action on the others. In New Mexico, this partitioning would run afoul of the Double Jeopardy Clause. *See State v. Boeglin*, 90 N.M. 93, 95, 559 P.2d 1220, 1222 (Ct.App.1977) ("An offense may not be split into many parts and made the subject of multiple prosecutions."). It would be incum-

bent on the State to prove that it was not splitting the same offense in order to preserve the tactical advantages of bringing a separate forfeiture action.

## IX. PUNISHMENT

{61} The third *Schwartz* factor, whether both proceedings impose punishment, is the most contentious. Though this factor and the second part of the *Ursery/89 Firearms* test address the same basic question, *Schwartz* does not defer to legislative intent nor does it require the insurmountable "clearest proof" standard.

### A. The Punitive/Remedial Evaluation under *Schwartz*

{62} As mentioned above, in *Schwartz* we stated that the punitive or remedial nature of a sanction is established by looking at the purposes behind the statute that authorizes the sanction. *Schwartz*, 120 N.M. at 631, 904 P.2d at 1056; *accord Whitener*, 117 N.M. at 133, 869 P.2d at 832 (describing the holding of *Halper*, 490 U.S. at 448, 109 S.Ct. 1892, and stating that "the determination of whether a given civil sanction constituted punishment required a particularized assessment of the penalty imposed and the purposes that the penalty may be fairly said to serve").

{63} As noted above, *Schwartz* makes it clear that a nonpunitive sanction need not be "'solely'" remedial. *Schwartz*, 120 N.M. at 633–34, 904 P.2d at 1058–59 (discussing statement from *Halper*, 490 U.S. at 448, 109 S.Ct. 1892, that "a civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term" (emphasis added)). *Schwartz* concluded that "the fact that the regulatory scheme has some incidental deterrent effect does not render the sanction punishment for the purposes of double jeopardy analysis." *Schwartz*, 120 N.M. at 633, 904 P.2d at 1058. Common sense tells us that there are circumstances in which the reverse is true as well: certain statutory schemes—like forfeitures under the Controlled Substances Act—may have certain remedial as-

pects though their purposes are primarily punitive.

{64} Thus, *Schwartz* indicates that determining whether a sanction is remedial or punitive for double-jeopardy purposes requires a balancing of all the purposes behind the sanction. *See id.* at 633–34, 904 P.2d at 1058–59 (indicating that an incidental deterrent purpose does not outweigh the remedial intent of a sanction). This is ascertained by examining the statutory scheme that creates the sanction. We also believe that if neither the remedial nor the punitive purposes predominate, the evaluation should be guided by whether the sanction affects a fundamental right. Thus, in a close case, if the right at stake were statutory, such as the loss of an administrative license, the most likely conclusion would be that the sanction is remedial. However, in the matter we address today, there is much disagreement about whether the purposes of forfeiture under the Controlled Substances Act are more remedial than punitive. Our conclusion about this matter is strongly influenced by the fact that the purpose of the sanction is to deprive the defendant of the fundamental constitutional right of "acquiring, possessing and protecting property." *See* N.M. Const. art. II, § 4. This creates a strong presumption that the sanction is punitive.

{65} Thus, as we explain below, while New Mexico's forfeiture statutes under the Controlled Substances Act have certain remedial goals, they primarily serve decidedly punitive objectives. Moreover, there are certain aspects—or earmarks—of these forfeiture laws that are demonstrative of their punitive nature. As one commentator concluded, "New Mexico's drug forfeiture statute, codified in its Criminal Offenses law, is intended as a penalty for convicted drug felons. It is penal and punitive in nature, not remedial, as most civil statutes purport to be." 1 Steven L. Kessler, *Civil & Criminal Forfeiture: Fed. & State Practice* § 9.04[5] (1999) (footnote omitted).

## B. Remedial Aspects of Forfeitures under the Controlled Substances Act

{66} In this section we will outline a number of remedial qualities that are usually ascribed to forfeitures associated with controlled-substances prosecutions. Even though some of these remedial qualities apply to the New Mexico Controlled Substances Act, they do not outweigh its punitive nature.

### 1. Reimbursement

{67} The most frequently mentioned objective is that forfeiture reimburses the government for the cost of its efforts to minimize the availability of illegal drugs including investigating, prosecuting, and incarcerating drug traffickers. Moreover, civil forfeiture allegedly helps compensate for the societal costs of the drug trade such as caring for victims, lost productivity, and social programs that combat the temptation of illegal drugs. *See* Arthur W. Leach & John G. Malcolm, *Criminal Forfeiture: An Appropriate Solution to the Civil Forfeiture Debate,* 10 Ga. St. U.L.Rev. 241, 260 n. 81 (1994) ("Forfeiture is remedial ... because it compensates the government for its expenditures on law enforcement activities and on other societal problems resulting from the offending instrumentalities."). There is no claim that forfeiture reimburses the government dollar for dollar, even if a specific dollar amount could be determined. Rather, forfeiture is defended as a "rough justice" remedy or a "a reasonable form of liquidated damages" designed to indemnify the costs related to the trafficking of controlled substances.[12] As explained below, the New Mexico Controlled Substances Act was created without this purpose in mind.

### 2. Removes harm

{68} Forfeiture is also ascribed the remedial objective of removing harm from society and from the stream of commerce. Thus, social betterment and not individual punishment is the goal when the state eliminates harmful substances, confiscates dangerous instrumentalities, abates nuisances, and impounds illegal goods.[13] There is little doubt that the removal of harm is an aspect of forfeitures under the Controlled Substances Act. But this aspect, by itself, does

not render forfeiture a predominately remedial sanction.

### 3. Confiscation of harmful property

{69} Similarly, the confiscation of contraband, and proceeds, and instrumentalities of the illegal drug trade is justified as a way of protecting society from harm. Possession of contraband, such as a controlled substance, is unlawful for all citizens and its forfeiture is not punishment. *See* J. Morris Clark, *Civil and Criminal Penalties and Forfeitures: A Framework for Constitutional Analysis*, 60 Minn. L.Rev. 379, 478 (1976). Proceeds are the profits of illegal activities and property purchased with those illegal profits and their forfeiture deprives the owner of nothing to which he or she is entitled. Cheh, *Easy, supra*, at 15. It is claimed as well that the forfeiture of instrumentalities-property that is used to facilitate a crime-serves remedial objectives. The harmful nature of such property and the remedial character of such forfeitures is disputed. *See* Eric Blumenson & Eva Nilsen, *Policing for Profit: The Drug War's Hidden Economic Agenda*, 65 U. Chi. L.Rev. 35, 45–46 (1998). Forfeiture of harmful property can be beneficial. However, this factor, even when considered with the other remedial qualities we mention, does not outweigh the punitive nature of forfeiture under the Controlled Substances Act.

### 4. Restitution

{70} Forfeiture proceeds can be used to provide restitution for victims of the illegal drug trade. *See* Nancy J. King, *Portioning Punishment: Constitutional Limits on Successive & Excessive Penalties*, 144 U. Pa. L.Rev. 101, 174 n. 215, 175 n. 216, 176 n. 220 (1995). However, New Mexico's Controlled Substances Act makes no provision for the direct compensation of victims. At best, victims may benefit obliquely when forfeited property or the proceeds of their sale revert to the general fund or are used by law enforcement agencies. *See* § 30–31–35(E) (permitting law enforcement agencies to use forfeited property or sell it and apply proceeds to state, county, municipal general funds).

### 5. Encouraging the proper management of property

{71} Often mentioned is the argument that forfeiture encourages property owners to actively manage their property to ensure that it will not be used for illegal purposes. *See Ursery*, 518 U.S. at 290, 116 S.Ct. 2135. Under federal law, innocent owners may lose property even when they never consent to or are completely unaware of the illegal use of their property.[14] Such an outcome in New Mexico is precluded, both by the innocent owner provisions of the Controlled Substances Act and by the determinations of our courts. *See* § 30–31–34(G)(1), (2), (4); *In re Forfeiture of One 1970 Ford Pickup Truck*, 113 N.M. 97, 100, 823 P.2d 339, 342 (Ct.App. 1991) (holding an innocent co-owner's portion of confiscated property not subject to forfeiture).

### C. Punitive Aspects of Forfeitures under the Controlled Substances Act

{72} In this section we shall explain the factors that demonstrate how forfeitures under the Controlled Substances Act were designed to be punitive.

### 1. New Mexico precedent regards forfeitures as punitive

{73} Were we to follow *Ursery's* holding that civil forfeitures are not punitive, we would be forced to repudiate over a quarter century of consistent and unequivocal statements by the New Mexico appellate courts that civil forfeiture is indeed quasi criminal, penal, and punitive in nature.[15] Moreover, the presumption that forfeiture is punitive can be traced to the earliest opinions of the Territorial Supreme Court, prior to our statehood.[16] This presumption continued after New Mexico was admitted into the Union.[17] In more recent years, the forfeiture of water rights has similarly been regarded as punishment.[18]

{74} The *Ursery* majority did not mention its holding in *Boyd v. United States*, 116 U.S. 616, 634, 6 S.Ct. 524, 29 L.Ed. 746 (1886), *overruled on other grounds by Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 302–07, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), that forfeitures have a "quasi criminal

nature." This concept was reiterated by the Court a number of times in the subsequent decades including another case the majority did not discuss, *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) (stating "a forfeiture proceeding is quasi-criminal in character"). In New Mexico, this "quasi-criminal" characterization of civil forfeitures was adopted from *1958 Plymouth*, and has become a fixture of our jurisprudence.[19] The validity of this quasi-criminal characterization is bolstered by the holdings of both New Mexico and federal appellate courts that the exclusionary rule applies to forfeiture proceedings. Evidence obtained in violation of the search and seizure protections guaranteed by the United States and New Mexico Constitutions can be used neither at the defendant's criminal trial nor at the forfeiture proceeding.[20]

{75} For these reasons, it is well established in New Mexico that, "[f]orfeitures are not favored at law and statutes are to be construed strictly against forfeiture." *State v. Ozarek*, 91 N.M. 275, 275, 573 P.2d 209, 209 (1978).[21] Forfeitures, "should be enforced only when within both the letter and the spirit of the law." *Mitchell v. City of Farmington Police Dep't (In re Forfeiture of Two Thousand Seven Hundred Thirty Dollars & No Cents)*, 111 N.M. 746, 748–49, 809 P.2d 1274, 1276–77 (1991) [hereinafter *$2730.00*]. We regard forfeiture with mistrust because it divests the individual of the right "of acquiring, possessing and protecting property"-one of the most fundamental liberty interests. *See* N.M. Const. art. II, § 4. It is "not a mere restraint on use, temporary loss, or a device used to satisfy pre-existing debts or secure jurisdiction." Cheh, *Easy, supra*, at 10. It is the most extreme sanction the state can bring against the property owner. *Id.* ("Forfeiture is to fines what capital punishment is to incarceration."). With regard to the fundamental right to property, the state can devise no penalty more extreme than taking away property without compensation. It is true that the state may impose penalties more harsh or expensive than the forfeiture of such property as an old car or a small amount of cash. But with regard to that car or cash, and the fundamental right

of ownership, no penalty is more extreme than stripping a person of that right without compensation.

{76} We would have to renounce a significant body of precedent were we to conclude that forfeitures were remedial rather than punitive. Though many of our early forfeiture cases are far removed from the sanctions contemplated by the Controlled Substances Act, New Mexico has never, in any context, in addressing any issue, ever effectuated a forfeiture without characterizing it as penal or quasi-criminal or punitive.

## 2. In rem

{77} The *Ursery* majority rests a preponderance of its rationale upon the in rem nature of the forfeiture proceeding, which it characterizes in terms of the guilty property fiction. In this segment we will explain why in rem jurisdiction and the guilty property fiction are not synonymous. Additionally, we shall show why the in rem doctrine does not imply, as *Ursery* suggests, that forfeiture is a remedial sanction. Rather, a proper understanding of in rem doctrine supports the conclusion that forfeiture is punitive for double-jeopardy purposes under the Controlled Substances Act.

### a. In rem jurisdiction is directed at persons' interests

{78} Most commonly, "in rem" is defined as a proceeding or action instituted against a thing in contradistinction to "in personam" actions which are directed against a person. Black's Law Dictionary 797. However, in modern jurisprudence, this definition is neither conceptually nor practically accurate. It is true that the names of the proceedings are styled as if the inanimate object were a defendant in a civil or criminal action. *See, e.g., State v. One 1967 Peterbilt Tractor (In re Seizure & Intended Forfeiture of One 1967 Peterbilt Tractor)*, 84 N.M. 652, 506 P.2d 1199 (1973). However, as the United States Supreme Court sagely observed over 120 years ago, "in a larger and more general sense, the terms are applied to actions between parties, where the direct object is to reach and dispose of property

owned by them, or of some interest therein." *Pennoyer v. Neff,* 95 U.S. 714, 734, 24 L.Ed. 565 (1878), *overruled on other grounds by Shaffer v. Heitner,* 433 U.S. 186, 206, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). An in rem action is directed, not *against* the property per se, but rather at resolving the interests, claims, titles, and rights in that property.[22] And it is persons-as individuals, governments, corporations-who possess those interests, claims, titles, and rights.[23]

{79} The in rem doctrine has its origins in the need for the court to have jurisdiction over property when its owner is absent, when there is no owner, or when the extent of ownership is unknown.[24] In such circumstances, in rem jurisdiction allows the court to dispose of the property, with absolute finality, as to everyone anywhere who has any interest in it whatsoever, whether they are present, absent, or unknown, and even if there is no owner. *Flesch v. Circle City Excavating & Rental Corp.,* 137 Ind. App. 695, 210 N.E.2d 865, 868–69 (1965) (an action in rem determines "the right in specific property against all of the world, equally binding on everyone") This quality of in rem jurisdiction is of significant value in a forfeiture proceeding under the Controlled Substances Act. Forfeiture under the Act deprives defendants of ill-gotten and ill-used property. However, the illegal drug trade is a global enterprise. In many cases one cannot presume that all those who have an interest in the property are known, have been apprehended, or are within the court's jurisdiction. *See* Stefan B. Herpel, *Toward a Constitutional Kleptocracy: Civil Forfeiture in America,* 96 Mich. L.Rev.1910, 1918 (1998) (review of Leonard Levy, *A License to Steal: The Forfeiture of Property* (1996)) (Some, if not most, defendants whose property is subject to forfeiture "are persons or entities over which an American court will typically have no personal jurisdiction."). In rem jurisdiction allows the court to divest any wrongdoer anywhere of any interest they may possess in that unlawful property.

### b. The guilty property fiction

{80} Our Court has previously criticized the in rem doctrine as being "rooted in the hoary annals of admiralty law" when courts often could not obtain in personam jurisdiction over those who committed maritime offenses, but could obtain in rem jurisdiction over the wrongdoers' ocean vessels. *$2730.00,* 111 N.M. at 748, 809 P.2d at 1276; *see also* Herpel, *supra,* at 1916–19. Thus, in maritime law, an action was brought against a ship as if it were the wrongdoer. This aspect of in rem doctrine is known as the guilty property fiction. This fiction treats inanimate objects as if they were sentient beings.

{81} The guilty property fiction-as opposed to the less theoretical and more practicable understanding of in rem jurisdiction which recognizes its effect on persons-is indispensable to all the *Ursery* Court's arguments that forfeitures are not punishment.[25]

> [This] forfeiture proceeding ... is *in rem.* It is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient. In a criminal prosecution it is the wrongdoer in person who is proceeded against, convicted, and punished. *The forfeiture is no part of the punishment for the criminal offense. The provision of the Fifth Amendment to the Constitution in respect of double jeopardy does not apply.*

*Ursery,* 518 U.S. at 275, 116 S.Ct. 2135 (quoting *Various Items of Personal Property v. United States,* 282 U.S. 577, 581, 51 S.Ct. 282, 75 L.Ed. 558 (1931) (alteration, omissions, and emphasis in original)). Because only persons can be punished, the majority's claim that persons are not the object of a forfeiture action separates forfeiture from the realm of punishment.

{82} However, in New Mexico, we have expressly dismissed the guilty property fiction as "anachronistic" and not reflective of the true nature of an in rem civil forfeiture proceeding under the Controlled Substances Act. *See $2730.00,* 111 N.M. at 748, 809 P.2d at 1276; *see also 1970 Ford Pickup,* 113 N.M. at 99, 823 P.2d at 341. In fact, this Court has noted that the United States Supreme Court itself has characterized this fiction "as ' "archaic," "an animistic survival from remote times," "irrational" and "atavistic." ' " *$2730.00,* 111 N.M. at 748, 809 P.2d at

1276 (quoting *Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 23, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960) (quoting *In re The R. Lenahan, Jr.*, 48 F.2d 110, 112 (2d Cir.1931))). These criticisms are still valid and distinctive aspects of New Mexico law.

### c. In rem jurisdiction is punitive

{83} "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV." Oliver Wendell Holmes, *The Path of Law*, 10 Harv. L.Rev. 457, 469 (1897). The fact that the guilty property fiction is old does not mean it is either venerable or applicable to modern law. *See* Leading Case, *Double Jeopardy Clause–In Rem Civil Forfeiture*, 110 Harv. L.Rev. 206, 214 (1996) ("In *Ursery*, the Court failed to recognize that modern civil forfeiture is far different in application, motivation, and result from the civil forfeiture statutes used in 'the earliest years of this Nation.'" (quoting *Ursery*, 518 U.S. at 274, 116 S.Ct. 2135)). Once it is accepted that the purpose of in rem forfeiture is to target, not the property by itself, but a person's interest in that property, it is self-evident that the forfeiture is punishment.[26]

> To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles. A man's liability for a demand against him is measured by the amount of property that may be taken from him to satisfy that demand. In the matter of liability, a man and his property cannot be separated . . . .

*Place v. Norwich & N.Y. Transp. Co.*, 118 U.S. 468, 503, 6 S.Ct. 1150, 30 L.Ed. 134 (1886); *see also Continental Grain*, 364 U.S. at 23–24, 80 S.Ct. 1470.

{84} The problems that gave rise to the guilty property fiction still exist: courts must still deal with property that has no owner and defendants who do not reside within the jurisdiction or who are unidentified. The purpose of in rem jurisdiction, even in its most archaic form, was to extend the jurisdiction of the courts. It still serves the same purpose. However, it must not be forgotten that the in rem action is directed, not at the property itself, but at any interest that may exist in that property, and that when, as the consequence of a crime, the court divests a defendant, without compensation, of any interest in property-that defendant has been punished. In rem was never intended, and should never be interpreted, to abrogate fundamental constitutional rights.

### 3. Deterrence

{85} "Deterrence" is defined as "[t]he act or process of discouraging certain behavior, particularly by fear." Moreover, as an objective of criminal law, deterrence connotes "the prevention of criminal behavior by fear of punishment." Black's Law Dictionary 460. Deterrence is a way of using the punishment of a defendant as an example to others who might be tempted to commit the same crime. It is an announcement to the world of the consequences for those who are caught committing the prohibited act. *See* Mary M. Cheh, *Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objectives: Understanding and Transcending the Criminal–Civil Law Distinction*, 42 Hastings L.J. 1325, 1355 n. 166 (1991) [hereinafter Cheh, *Constitutional*]. "In order for a deterrent to be effective, the potential costs to that individual, discounted by the probability that the individual will incur such costs, must be sufficiently high to dissuade her [or him] from taking that action. Thus, the strength of the deterrent depends on the size of the penalty." Leading Case, *supra*, at 212. Sanctions that deter are different from those that remedy. A deterrent "must amount to more than recompense or restitution. The theory is that humans, as rational weighers of the risks and benefits of their actions, will risk being penalized if the worst they face is having to pay market value for their illicit gains." Cheh, *Constitutional, supra*, at 1355 (1991) (footnote omitted).

{86} It is universally acknowledged that our forfeiture statutes are meant to deter those who contemplate trafficking in controlled substances. As the definition indicates, deterrence is accomplished by instilling fear in potential drug dealers. The cost of the forfeiture is designed to exceed, if possible, any profitability from the crime. *See* Leading Case, *supra*, at 212. Defendants are deprived of all the profits and

proceeds of their drug trade, and potentially any worldly goods, including legally acquired property, that served as an instrumentality to crime. The harsh punishment is intended as an object lesson to the world of the consequences of being involved with illegal drugs. This deterrent function of forfeitures under the Controlled Substances Act serves a decidedly punitive purpose.

### 4. No correlation to harm

{87} It is apparent that, on their face, the forfeiture provisions of the Controlled Substances Act were never intended to serve as a source of restitution for the state's costs of investigating and prosecuting the crime, the harm to any innocent victims from illegal drug trade, or the unmeasurable cost to society from the trafficking of controlled substances. *See* Cheh, *Easy, supra,* at 18 ("[C]ivil asset forfeitures never were intended to serve as a form of restitution nor are they designed to serve that goal."). A statute that attempted to, for example, recompense the government for its investigation and prosecution costs, would devise a fine that reasonably approximated the dollar amount of the government's efforts, based upon past average expenditures. In contrast, under the Controlled Substances Act, the value of the property forfeited is never mentioned and has absolutely no bearing on the reasons for its confiscation.[27] The statute makes no demand that the State correlate its prosecutorial expenses to the value of the seized property. *See* Cheh, *Easy, supra,* at 10 ("Whether the nature or the value of any property seized bears any equivalence to harms caused by use of the property or to the culpability of the property owner is pure happenstance."). The Legislature did not intend to overwhelm the courts with contentious accountings of the costs associated with the illegal drug trade.

{88} Moreover, under the Act, the law enforcement agency seizing the property may "take custody of the property for use by law enforcement agencies in the enforcement of the Controlled Substances Act or remove it for disposition in accordance with law." Section 30–31–35(E)(2). This aspect of contemporary forfeiture law has been much criticized and raises serious constitutional concerns.[28] The law enforcement agency may keep the forfeited property or the proceeds therefrom. Section 30–31–35(E). But the value of the property is applied toward the nebulous enterprise of enforcing the Act. Section 30–31–35(E)(2). Nothing in this statute requires the value of the property to be applied in a remedial fashion to reimbursing the agency's costs in prosecuting the specific crime from which the property was derived.

{89} If it is clear that the sanction greatly exceeds the quantum of harm, then it is punitive. Conversely, forfeiture is no more remedial if the state's expenditures or the cost of the harm exceed the value of the forfeited property. In fact, the State indicated that it may have lost money in the prosecution of both Nunez and the Vasquezes even after forfeiting their property. These disparities merely underscore the contention that the forfeitures are punitive. The cases of Nunez and the Vasquezes further illustrate that any parity between costs and recovery under the Controlled Substances Act is both coincidental and unintentional. Also unpersuasive is the notion, set forth in *Halper* and mentioned by the State, that forfeitures are a "rough justice" approximation of the monetary costs of the crime. *See Halper,* 490 U.S. at 446, 449, 109 S.Ct. 1892. Such a rationale is merely an admission that value of the sanction is unrelated to the cost of ameliorating the harm and further underscores the punitive nature of these forfeitures.

{90} If a remedial sanction is designed to recompense the utterly incalculable social costs of the illicit drug trade then there is no question that civil forfeiture is punitive. There will never be a consensus about the monetary value of the social damage caused by illegal drugs, much less any particular defendant's share of that cost. The property is taken without regard to its value or the defendant's portion of responsibility for the social devastation. The forfeiture can, thus, only be characterized as a sanction whose correlation to the harm is completely arbitrary-in other words it is punishment. *See* King, *supra,* at 164 (stating that a civil sanction is punitive if, "assuming the statute does

makes some attempt [sic] to calibrate sanctions to a remedial purpose, that the particular sanction in question was imposed in a form or amount unrelated to that purpose").

### 5. Tied to crime

 {91} Among the most compelling arguments that civil forfeiture is punitive is that it is conditioned upon the commission of a crime. The forfeiture necessarily requires proof of the criminal offense and by its terms compels the defendant to relinquish property rights precisely because he or she has committed a crime.[29] Our Court of Appeals was correct in determining "that the legislature's choice to tie forfeiture directly to the commission of drug offenses under the Controlled Substances Act confirms the punitive nature of these provisions." *Albuquerque Police Dep't v. Martinez (In re Forfeiture of Fourteen Thousand Six Hundred Thirty Nine Dollars)*, 120 N.M. 408, 412–13, 902 P.2d 563, 567–68 (Ct.App.1995) [hereinafter *$14,639* ].

### 6. Innocent owner

{92} Our forfeiture statute includes some innocent owner provisions. A common carrier is not subject to forfeiture "unless it appears that the owner or other person in charge of the conveyance is a consenting party or privy to a violation of the Controlled Substances Act." Section 30–31–34(G)(1). Aircraft, vehicles, and vessels cannot be forfeited if the violation of the Act was "committed or omitted without [the owner's] knowledge or consent." Section 30–31–34(G)(2). The "forfeiture of a conveyance encumbered by a bona fide security interest shall be subject to the interest of a secured party if the secured party neither had knowledge of nor consented to the" violation of the Act. Section 30–31–34(G)(4).

 {93} Our Court of Appeals properly concluded that these innocent owner provisions demonstrate the "legislature's intent to punish only those persons involved in drug trafficking." *$14,639*, 120 N.M. at 413, 902 P.2d at 568. The force of this reasoning is exemplified by our Court of Appeals holding in *In re Forfeiture of One 1970 Ford Pickup*, mentioned above, which protected an inno-

cent co-owner from forfeiting her proportionate interest in property because of the crimes of a guilty co-owner. 113 N.M. at 100, 823 P.2d at 342. Federal law is less respectful of the rights of innocent people than we are in New Mexico. There are no New Mexico controlled-substances cases that have affirmed the forfeiture of property when the owner was completely unaware of any illegal activity by the lessors or borrowers as in *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–90, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (holding that forfeiture of a yacht, after police found marijuana on board, was not unconstitutional even though owner-lessor of yacht was totally innocent and unaware of presence of drugs), or *United States v. One 1978 Chrysler Le Baron Station Wagon*, 648 F.Supp. 1048, 1051 (E.D.N.Y.1986) (affirming forfeiture of innocent company's car which was used to transport drugs by an employee who was the son of the company's president and primary stockholder). Forfeiture in New Mexico is a sanction that applies only to wrongdoers. "If forfeiture had been understood not to punish the owner, there would have been no reason to reserve the case of a truly innocent owner. Indeed, it is only on the assumption that forfeiture serves in part to punish that the Court's past reservation of that question makes sense." *Austin v. United States*, 509 U.S. 602, 617, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993).

### D. Summation

 {94} Because of the strength of New Mexico precedent, the punitive nature of in rem jurisdiction, the deterrent function of the sanction, the lack of correlation between the penalty and the crime, the fact that the sanction is tied to a crime, the exclusion of innocent owners from the sanction, and the fact that a fundamental right is affected, we conclude that the remedial objectives of forfeitures under the Controlled Substances Act are incidental, and that the purposes of the sanction are decidedly punitive for double-jeopardy purposes.

### X. PROCEDURAL ISSUES

{95} With the exception of *Chavez*, all the cases in these consolidated appeals were

resolved by guilty pleas to the criminal charges, forfeitures as a result of default judgments, or both. The State argues that the defendants waived their double-jeopardy defense with their plea agreements and that jeopardy did not attach with the default judgments, and, thus, their double-jeopardy claims are barred. We disagree.

### A. Plea Agreements

{96} The State maintains that the guilty plea of Gallegos resulted in a waiver of the defendant's double-jeopardy claims. The State bases its argument on *Montoya v. New Mexico,* 55 F.3d 1496 (10th Cir.1995). In *Montoya,* the defendant violated the terms of his probation. As a result, his probation was revoked and he was sentenced to his previously suspended sentence plus an additional four years under the Habitual Offender Act, NMSA 1978, §§ 31–18–17 to –20 (1977, as amended through 1993). In a federal habeas petition brought before the Tenth Circuit Court of Appeals, Montoya contended that the additional four years amounted to an increased sentence after retrial in violation of double jeopardy. *Montoya,* 55 F.3d at 1497–98. The Tenth Circuit held that Montoya had waived his double-jeopardy claim under the United States Constitution because he agreed, in his original plea bargain, to a sentence enhancement if he should ever violate probation. *Id.* at 1499. The Tenth Circuit declined to apply the New Mexico nonwaiver statute, Section 30–1–10, because it raised a statutory-rather than constitutional-claim, and "[s]tate claims are not cognizable in habeas proceedings unless they are constitutional in nature." *Id.* *Montoya* is distinguishable from the cases before this Court because it was decided under the United States Constitution, not under the laws of the State of New Mexico.

{97} In the case of *Gallegos* before us today, we interpret the effect of the defendant's plea agreement under the New Mexico Constitution and New Mexico law. Generally, a guilty plea waives the right to appeal. *State v. Handa,* 120 N.M. 38, 41, 897 P.2d 225, 228 (Ct.App.1995). There are exceptions to this rule, however. One exception applies when the defendant has reserved an

issue for appeal as part of the plea agreement. *See State v. Hodge,* 118 N.M. 410, 415–16, 882 P.2d 1, 6–7 (1994). Another exception applies when, as in this case, the issue raised on appeal concerns a double-jeopardy claim.

{98} As we have stated above, under the New Mexico anti-waiver statute, the double-jeopardy defense may be raised at any time, both before and after judgment. Section 30–1–10; *see Breit,* 1996–NMSC–067, ¶ 11, 122 N.M. 655, 930 P.2d 792 ("The right to be protected from double jeopardy is so fundamental, that it cannot be relinquished even if a conviction is affirmed on appeal."). A plea agreement, which may result in the waiver of other potential claims, has no effect on a defendant's right to raise a double-jeopardy defense. *See Handa,* 120 N.M. at 42–43, 897 P.2d at 229–30; *State v. Jackson,* 116 N.M. 130, 132–33, 860 P.2d 772, 774–75 (Ct.App.1993).

{99} We note that the Court of Appeals, in addressing this issue in *Handa,* 120 N.M. at 40–43, 897 P.2d at 227–30, and *Jackson,* 116 N.M. at 132–33, 860 P.2d at 774–75, while relying on the anti-waiver statute, also applied an exception established in *United States v. Broce,* 488 U.S. 563, 569, 574–76, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989), to the general rule that a guilty plea waives appeal of all issues. *Broce* is only applicable to federal constitutional claims. The anti-waiver statute is sufficient to permit a defendant to raise a double-jeopardy claim on appeal even if that claim was not raised before the trial court and even though the defendant entered into a guilty plea agreement which was not conditioned on reservation of that claim.

{100} We thus hold that Gallegos did not waive his double-jeopardy claim by entering into a guilty plea agreement.

### B. Default Judgments

{101} Because Nunez, Gallegos, Edward Vasquez, and Marguerite Vasquez failed to appear at their forfeiture hearings, their property was forfeited by default judgment. The State would have us dismiss their double-jeopardy claims on the basis that

jeopardy cannot attach if the defendants made no appearance during the forfeiture proceedings. The State suggests that because the defendants never appeared and never filed claims or answers, they were not parties and waived their rights to contest the forfeiture actions. This means, according to the State, that the defendants were never put at risk, the sanction was not applied directly against them, they voluntarily abandoned their property, were not punished by the forfeiture, and were thus never placed in jeopardy. Federal courts have adopted this line of reasoning.[30]

{102} It is absurd to claim that a person is not punished by a default forfeiture judgment. As we have explained, we look to the purpose served by statutory sanctions in order to determine whether they are punitive in nature. *Schwartz*, 120 N.M. at 631, 904 P.2d at 1056; *accord Whitener*, 117 N.M. at 133, 869 P.2d at 832. We have now established that the New Mexico forfeiture statutes are unquestionably punitive, not only in their effect, but in their purposes. Once the punitive nature of the forfeiture statutes is established, it is nonsense to hold that the state seeks to punish if the defendant appears, but not if the defendant fails to appear. If punishment is intended, jeopardy attaches. Whether the court has punished the defendant depends upon the character of the sanction—the deprivation of property through forfeiture—and not upon defendant's presence or absence during the proceeding.

{103} We hold that jeopardy does attach upon the entry of a default judgment in a forfeiture proceeding under the Controlled Substances Act.

## XI. SINGLE TRIAL

{104} We hold that civil forfeiture under the Controlled Substances Act is punishment for double-jeopardy purposes under the New Mexico Constitution. We therefore hold that, henceforth, all forfeiture complaints and criminal charges for violations of the Controlled Substances Act may both be brought only in a single, bifurcated proceeding. The single proceeding will eliminate the potential for double-jeopardy violations. *See* Luis Garcia–Rivera, Comment, *Dodging Double Jeopardy: Combined Civil and Criminal Trials*, 26 Stetson L.Rev. 373, 375–76 (1996) ("[T]he only feasible way to avoid double jeopardy is to bring both civil and criminal suits in one combined proceeding."). It will also remedy some of the other factors that bring into question the fairness of modern forfeiture. Most notably, the indigent defendant will have available the assistance of counsel in the forfeiture proceeding because both the property and the criminal actions will take place in a single trial.[31] Of course, the State is not restricted from bringing only a criminal action or only a forfeiture action. However, if it elects to bring both a forfeiture complaint and a criminal proceeding growing out of the same facts, the action may be brought only in a single, bifurcated proceeding.

{105} We are not unmindful that a single proceeding may pose some logistical or procedural complexities. *See, e.g.*, Garcia–Rivera, *supra*, at 398–404 (discussing procedural differences between criminal trial and civil forfeiture). However, bifurcated proceedings are a common mechanism for dealing with factually identical but procedurally distinct aspects of a single action.[32] There is no other way, under current New Mexico law, that the State will be able to prosecute, under the Controlled Substances Act, both the crime and the forfeiture.

## XII. BURDEN OF PROOF

{106} One of the most onerous aspects of the New Mexico forfeiture statutes is that the defendant bears the burden of showing that he or she should be exempt from the provisions of the forfeiture statutes:

It is not necessary for the state to negate any exemption or exception in the Controlled Substances Act in any complaint, information, indictment or other pleading or in any trial, hearing or other proceeding under the Controlled Substances Act. The burden of proof of any exemption or exception is upon the person claiming it.

Section 30–31–37. This ambiguous language fails to specify the precise burden of proof borne by the State when it initiates a forfei-

ture action. Forfeiture is nominally a civil action. *See $14,639*, 120 N.M. at 413, 902 P.2d at 568 (forfeiture requires "a civil burden of proof"). Under a civil burden of proof, the State would only need to establish its case by a preponderance of the evidence. *See* UJI 13–304 NMRA 1999 ("It is a general rule in civil cases that a party seeking a recovery [or a party relying upon a defense] has the burden of proving every essential element of the claim [or defense] by the greater weight of the evidence.").

{107} However, Section 30–31–37 may be a statutory exception to the general rule that civil claims must be established by a preponderance of the evidence. Its ambiguous language suggests that the burden of proof in a forfeiture action is not on the State to prove that the property was used in a crime, but on the defendant to prove that it was not. This leaves open the possibility that the State is initially required to offer no more than probable cause that the property in question is contraband, proceeds, or the instrumentality of a drug crime. This is a standard adopted by federal law and by some states. *See* Sean M. Dunn, Note, *United States v. Ursery: Drug Offenders Forfeit Their Fifth Amendment Rights*, 46 Am. U.L.Rev. 1207, 1212–15 (1997) (discussing burdens of proof under federal law).

{108} The fact that the State bears a low burden of proof—be it either probable cause or preponderance of the evidence—when it initiates the deprivation of a fundamental constitutional right raises grave due process concerns. *See Schaefer v. Whitson*, 32 N.M. 481, 484, 259 P. 618, 619 (1927). ("Appellant's right to be protected in the possession of his property is fundamental. His objection is not strictly legal, technical or unsubstantial. It goes to the very right itself."). It is true that in *State v. Ozarek*, 91 N.M. at 276, 573 P.2d at 210, we stated "that the burden imposed on the owner is the burden of going forward and not the burden of persuasion." However, any fairness to the defendant is undermined by the fact that the State can rebut any defense by no more than a preponderance of the evidence.

{109} The advantages to the State under these circumstances cannot be overstated. At the time the forfeiture action is filed, the property is almost always already in possession of the State because it was confiscated at the time of the arrest. The proceeding begins with a virtual presumption that the confiscation was proper. Moreover, because forfeitures are nominally civil proceedings, protections that are indispensable in a criminal setting—such as proof beyond a reasonable doubt, the right to counsel, presumption of innocence, the right to confront one's accusers—are not guaranteed. *See Helvering v. Mitchell*, 303 U.S. 391, 401–04, 58 S.Ct. 630, 82 L.Ed. 917 (1938). The State's case can be established with evidence that would be inadmissible in a criminal court, and oftentimes the defendants cannot afford counsel either because they are indigent or because the property that would be used to pay a lawyer has been taken by the State.[33] Critics argue that absolving the government of a stringent burden of proof has "shifted the power to impose economic sanctions from judges to prosecutors." David B. Smith, *Asset Forfeiture: A Serious Threat to Our Property Rights*, Briefly ... Perspectives on Legis., Reg., & Litig., Oct. 1998, at 3 [hereinafter Smith, *Threat*]. We agree that applying the civil burden of proof to forfeitures under the Controlled Substances Act places an unfair burden on defendants.

{110} We therefore hold that, in the forfeiture portion of the trial, the burden of proof will be on the State to prove by clear and convincing evidence that the property in question is subject to forfeiture. In doing so, we are joining the Supreme Court of Florida's decision to place this standard of proof upon state forfeiture proceedings. *See Department of Law Enforcement v. Real Property*, 588 So.2d 957, 967 (Fla.1991) ("We conclude that the state has the burden of proof at trial, which should be by no less than clear and convincing evidence."). This is a measure urged by many critics of drug-related forfeitures. *See, e.g.,* Smith, *Threat, supra,* at 25.

{111} We are not expressly deciding at this time whether the burden of proof set forth in Section 30–31–37 is always unconstitutional. That statute may still apply in a solitary forfeiture action that involves no

criminal prosecution. However, in a bifurcated proceeding, both the criminal portion and the forfeiture portion are unquestionably criminal in nature. "The property owner effectively stands accused of either criminality outright or indifference to it." Cheh, *Easy, supra*, at 38. In a criminal proceeding the State cannot be relieved of the burden of establishing under a stringent standard of proof that a defendant should be stripped of a constitutional right—the right of "acquiring, possessing and protecting property." *See* N.M. Const. art. II, § 4.

## XIII. RETROACTIVITY

 {112} The final question is the extent to which our holding today applies retroactively. The New Mexico Constitution provides that, "[n]o act of the legislature shall affect the right or remedy of either party, or change the rules of evidence or procedure, in any pending case." N.M. Const. art. IV, § 34. The threshold question in retroactively applying a new rule of criminal law is whether doing so would violate constitutional prohibitions against ex post facto laws. *See* U.S. Const. art. I, § 10 (states may not pass ex post facto laws); N.M. Const. art. II, § 19 (same prohibition). The Latin phrase "ex post facto" implicates in its literal meaning any law passed "after the fact." Generally, this means "that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

{113} In *Santillanes v. State* we set forth factors to be considered in determining whether a new rule of criminal law should be applied retroactively: "[R]etrospective or prospective application must be determined on a case by case basis by looking at three issues: the purpose of the new rule, the reliance placed upon the old rule, and the effect upon the administration of justice that retroactive application would have." *Santillanes v. State*, 115 N.M. 215, 224, 849 P.2d 358, 367 (1993). This three-pronged analysis was taken by the *Santillanes* Court from the 1965 United States Supreme Court case, *Linkletter v. Walker*, 381 U.S. 618, 636, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *overruled by Griffith v. Kentucky*, 479 U.S. 314, 320–22, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).[34]

 {114} The retroactive application of law is triggered at the moment when a change of law becomes enforceable. A change of law by an appellate court is not established until the date the court's opinion is filed. Obviously, once the new rule is enforceable, it will apply to all subsequently filed cases. Conversely, it seems apparent that a change of law by an appellate court will have no retroactive application to any case that is finalized before the date the court's decision is filed. *State v. Rogers*, 93 N.M. 519, 521, 602 P.2d 616, 618 (1979) ("The question of whether or not a rule of law is to be applied retrospectively arises only for causes that have been finalized."). A case is finalized when "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith*, 479 U.S. at 321 n. 6, 107 S.Ct. 708. Between these extremes are cases that are pending on the rule's effective date. In those circumstances, on direct appeal, retroactivity is limited to two situations: either the issue that is addressed by the new rule must be raised and preserved below, or the failure to apply the rule must constitute fundamental error.[35]

{115} However, when the new rule applies to the protection against double jeopardy, it is not apparent that retroactive application should be precluded from finalized cases. Moreover, it is evident that the preservation and fundamental error requirements for pending cases do not apply. This is because, under New Mexico's non-waiver statute, Section 30–1–10, the double-jeopardy defense cannot be waived and may be raised at any time, including on appeal. Conceivably, under our holding today, the non-waiver provision could require the State to reopen cases as old as 1972 when the Controlled Substances Act was first passed. This question was alluded to by our Court in *Jackson v. State*, 1996–NMSC–054, ¶¶ 3–8, 122 N.M. 433, 925 P.2d 1195. We chose to "address the issue of retroactivity on its merits" but

expressly avoided analyzing the applicability of the non-waiver statute. *Id.* ¶ 5.

{116} We conclude that the retroactive application of our holding today to finalized cases would, under the *Santillanes* test, have a deleterious "effect upon the administration of justice." *Santillanes*, 115 N.M. at 224, 849 P.2d at 367. Evaluating the validity of old and forgotten forfeitures under the Controlled Substances Act would be unjust because of the mere impracticality of recovering evidence, regenerating court records, sorting out the relevant criminal charges, retrieving property, refreshing the memories of witnesses, and locating parties. It would be so difficult to breathe life into the many ancient cases that neither the State nor the former defendants would be guaranteed a fair adjudication. Sometimes the only possible way of ameliorating past wrongs is by assuring that they never happen in the future. We hold that our decision today will be retroactive only to those cases that are pending on the date this opinion is filed.

## XIV. CONCLUSION

{117} We hold that the New Mexico Double Jeopardy Clause forbids bringing criminal charges and civil forfeiture petitions for the same crime in separate proceedings. Our holding is unaffected by whether jeopardy attached first in the criminal proceeding or in the civil forfeiture action. Moreover, the defendants' double-jeopardy rights are unaffected by either guilty pleas or default judgments.

{118} In the cases of Chavez and Nunez, we affirm the dismissal of their criminal charges. Further, we reverse the criminal convictions of Gallegos, Edward Vasquez, and Marguerite Vasquez.

{119} We further order that, henceforth, civil forfeiture complaints and criminal charges for the same crime under the Controlled Substances Act may both be brought only in a single, bifurcated proceeding. Furthermore, in the forfeiture portion of the proceeding, the State must prove its case by clear and convincing evidence. Our holding today is retroactive to cases pending on the date this opinion is filed.

{120} **IT IS SO ORDERED.**

MINZNER, C.J., and THOMAS A. DONNELLY, Judge New Mexico Court of Appeals (sitting by designation), concur.

BACA and SERNA, JJ., (Dissenting).

## ORDER ON MOTIONS FOR REHEARING

{121} Motions for rehearing having been filed in this case together with briefs submitted by the parties and the Court being fully advised: The motions for rehearing hereby are denied.

{122} In order to clarify one portion of the opinion, however, we have opted to do so by this separate published Order. *See State v. Gonzales*, 1999 NMSC–033, ¶ 32, 128 N.M. 44, 989 P.2d 419.

{123} The question arises whether the State may be permitted to set aside default judgments it has obtained in *pending cases* so that it may proceed with criminal prosecutions which would otherwise constitute double jeopardy. Rule 1–055(C) NMRA 2000 provides: "For good cause shown, the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 1–060." In general, "because default judgments are disfavored and causes generally should be tried on their merits, we have counseled trial courts to be liberal in determining the existence of grounds that satisfy Rule 60(B)." *Sunwest Bank of Albuquerque v. Rodriguez*, 108 N.M. 211, 213, 770 P.2d 533, 535 (1989). "A trial court has abused its discretion in setting aside a default judgment if its decision constituted arbitrary or unreasonable action." *Id.* "When there are no intervening inequities, any doubt should, as a general proposition, be resolved in favor of the movant to the end of securing a trial upon the merits." *Springer Corp. v. Herrera*, 85 N.M. 201, 203, 510 P.2d 1072, 1074 (1973).

{124} There are a number of authorities for the proposition that any party obtaining a default may move to have it set aside. 10 James Wm. Moore et al., *Moore's Federal Practice* § 55.50[2][f] (3rd ed.1999); *Ferraro v. Arthur M. Rosenberg Co.*, 156 F.2d 212,

214 (2d Cir.1946); *Gray v. John Jovino Co.,* 84 F.R.D. 46, 47 (E.D.Tenn.1979) ("And, as was stated by a panel, [in *Ferraro* ] upon which sat the late Judge Learned Hand, even where it is the plaintiff who seeks to set aside the defendant's default judgment, '... whoever makes the motion must show an adequate basis for it ...' "). The issue was also considered in *School City of Gary v. Continental Elec. Co.,* 158 Ind.App. 132, 301 N.E.2d 803, 810 (1973), in which Justice Black in *Klapprott v. United States,* 335 U.S. 601, 614–15, 69 S.Ct. 384, 93 L.Ed. 1099 (1948) is quoted: "In simple English, the language of the 'other reason' clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *See also* William H. Danne, Jr., Annotation, *What Constitutes 'Good Cause' Allowing Federal Court to Relieve Party of His Default Under Rule 55(c) of the Federal Rules of Civil Procedure,* 29 A.L.R. Fed. 7 (1976) ("While it is usually the party suffering the default entry who moves to set it aside, Rule 55(c) does not preclude the party who obtained the default from doing so.")

{125} We, therefore, hold that it is appropriate, to accomplish justice, to allow the State to move to set aside default forfeiture judgments already obtained in *pending cases* and to proceed in one bifurcated criminal prosecution in the manner set out in the filed opinion.

{126} Justices Baca and Serna dissent from the original opinion.

{127} **IT IS SO ORDERED.**

/S/ PAMELA B. MINZNER
PAMELA B. MINZNER, Chief Justice

/S/ JOSEPH F. BACA
JOSEPH F. BACA, Justice

/S/ GENE E. FRANCHINI
GENE E. FRANCHINI, Justice

/S/ PATRICIO M. SERNA
PATRICIO M. SERNA, Justice

/S/ PETRA JIMENEZ MAES
PETRA JIMENEZ MAES, Justice

SERNA, Justice (dissenting).

{128} I must respectfully **DISSENT.** Under the majority opinion, New Mexico stands alone from both the federal analysis and the analysis of other states, despite the fact that *Ursery* has been examined by numerous state courts. In its radical departure, the majority even goes much further than the proposed analysis by Justice Stevens, the only Justice on the United States Supreme Court who dissented from *Ursery.* Ultimately, I am not persuaded that we should reject *Ursery,* and even if I were, I believe the opinion errs by creating a constitutionally protected property right to drug proceeds.

## I. The Majority Creates a Constitutional Right to the Proceeds of Crime

{129} The majority's proceeds of crime analysis is, to me, deeply troubling. In a laudable attempt to simplify this area of law, the majority simply goes much too far. In doing so, I believe the majority ignores the admonition in *Breit* that "[r]aising the bar of double jeopardy should be an exceedingly uncommon remedy." *Breit,* 1996–NMSC–067, ¶ 35, 122 N.M. 655, 930 P.2d 792. The majority defines proceeds as the "monetary profits derived from an illegal enterprise as well as any goods or investments purchased with that money." *Majority Opinion,* ¶ 35.[1] The majority holds that "[n]o one has the right, under Article II, Section 4 of our Constitution, to acquire, possess, or protect contraband. However, in the forfeiture of *all other types of property* under the Controlled Substances Act, jeopardy attaches." *Majority Opinion,* ¶ 35 (emphasis added). In other words, the proceeds or fruits of crime (drug money or purchases made with drug money) are protected under Article II, Section 4 of the New Mexico Constitution under the majority opinion. This holding is both unprecedented and unsupported; it is also certainly bad policy.

---

1. The forfeiture statute's only reference to proceeds is "money which is a fruit" of the drug crime, and does not include purchases made with drug proceeds. Section 30–31–34(F).

Thus, by relying upon the definitions of academic commentators rather than our statute, the majority appears to be unintentionally expanding the scope of the statute.

94

{130} The majority takes the extraordinary step of elevating the fruits of crime to the level of a constitutional interest. *See Majority Opinion*, ¶ 75 ("It is true that the state may impose penalties more harsh or expensive than the forfeiture of such property as an old car or a small amount of cash. But with regard to that car or cash, and the fundamental right of ownership, no penalty is more extreme than stripping a person of that right without compensation."). Although there is some contrary language regarding proceeds within the opinion, *see Majority Opinion*, ¶ 69 (outlining remedial qualities of forfeiture and noting that one is that "[p]roceeds are the profits of illegal activities and property purchased with those illegal profits and their forfeiture deprives the owner of nothing to which he or she is entitled"),[2] any confusion in the majority's position on the forfeiture of drug proceeds is transcended by the majority's treatment of Defendants in these cases, particularly Defendant Chavez. If the majority intended to hold that the New Mexico Constitution does not protect drug proceeds, the majority would have reversed the dismissal of Chavez's criminal charges because the forfeiture of currency in his case would not have been punishment due to the fact that Chavez reached a settlement agreeing that this money was drug proceeds.

{131} Defendant Chavez was charged with, among other things, possession of marijuana with intent to distribute for two different occasions. As the majority notes, Defendant Chavez and APD reached "compromise settlements" regarding the currency. *Majority Opinion*, ¶ 7. APD kept $2529, and returned $1089 to Chavez. Chavez kept his van. In other words, currency was the only item Chavez forfeited, and he bargained for this result, thereby conceding that the currency which he forfeited to APD was the fruit of his illegal sale of drugs. Because there was no default judgment, even under

the majority's analysis, Chavez knowingly agreed that the money was drug proceeds. Chavez accepted and, in fact, bargained for the result in the forfeiture of his drug proceeds, and he did not appeal the forfeiture judgment. This Court has before it a final judgment by a New Mexico court that Chavez's currency was drug proceeds. Thus, the issue of whether Chavez's currency was legally acquired has been finally resolved and is not before this Court.

{132} Despite this judgment, the majority astonishingly, and without specific discussion, affirms the dismissal of Chavez's criminal charges on the basis of double jeopardy. In order to reach this result, the majority must conclude that the judgment involving Chavez in which he forfeited only drug proceeds to APD resulted in a deprivation of Chavez's constitutional right to property, thereby constituting punishment for purposes of the double jeopardy clause. Thus, the majority apparently concludes that in spite of Chavez's concession that the currency was drug proceeds, the forfeiture of the money constitutes jeopardy. It is indeed remarkable to create for drug dealers a constitutional right to the proceeds of their criminal activity.

{133} The same result is true for Defendant Gallegos, although this conclusion may be obscured by the fact that the forfeiture was obtained by a default judgment. Because Gallegos failed to contest the forfeiture of $299, the trial court entered a default judgment. Again, however, this is a final determination that Gallegos' currency was not legally acquired and was in fact the fruits of his crime. The majority, in the recitation of the facts, implies that Gallegos legally obtained his currency and could not contest the forfeiture due to his inability to afford an attorney.[3] *Majority Opinion*, ¶ 9. These

---

**2.** *See Majority Opinion*, ¶ 86 ("Defendants are deprived of all the profits and proceeds of their drug trade, and potentially any worldly goods, including legally acquired property, that served as an instrumentality to crime.").

**3.** The majority apparently has accepted Gallegos's argument that "there is utterly no evidence in the record to show that the $299 ... was either a proceed or an instrumentality of illegal

activity. Rather, the evidence in the district court presents a nearly airtight demonstration that the money came from [his] paycheck ...." This argument misunderstands the appropriate inquiry in this case. This appeal does not present the opportunity for this Court to review the validity or accuracy of the default judgment. Instead, the default judgment is a conclusive judicial finding that the money was the fruit of

facts are irrelevant; Gallegos does not challenge the validity of the forfeiture judgment, and thus, for purposes of this appeal, it is an established fact that Gallegos's currency is drug proceeds. By reversing Gallegos's conviction on double jeopardy grounds, the majority concludes that Gallegos was punished by forfeiting property to which, according to the majority, he has a constitutional right, which, as demonstrated, can only refer to his drug proceeds.

{134} By creating a constitutional property right in drug proceeds, the majority goes much further than even Justice Stevens in *Ursery*. Justice Stevens, in his dissent, writes that proceeds of crime are not a legal property interest, similar to illegal drugs and paraphernalia, and concurred in the affirmance of the conviction of defendants resulting in life imprisonment, and a $250,000 criminal fine, as well as forfeiture of currency in the amount of $405,089 in a separate proceeding because *"the forfeiture of such proceeds is not punitive."* *Ursery,* 518 U.S. at 298, 116 S.Ct. 2135 (Stevens, J., concurring in judgment in part and dissenting in part) (emphasis added). Justice Stevens concluded that "[t]he forfeiture of ... proceeds [of unlawful activity], like the *confiscation of money stolen from a bank,* does not punish respondents because it exacts no price in liberty or lawfully derived property from them." *Id.* (emphasis added). In other words, Justice Stevens believes that one has no right to the proceeds of a crime, such as drug money. This proposition is universally recognized, even by the commentators on whom the majority opinion so heavily relies.

> Seizure of the profits or proceeds of crime is similarly noncontroversial. The idea of depriving a criminal of the profits of his [or her] wrongdoing is rooted in equity and is morally compelling. The idea that one should not profit from [one's] own wrong undergirds the familiar equitable rule that

a killer cannot inherit from his [or her] victim.

Cheh, *Easy, supra,* at 15; *see e.g.,* Brand, *supra,* at 305 ("Neither forfeiture of the proceeds of crime, such as money obtained from a drug deal or property bought with that money, nor forfeiture of contraband, such as illegal drugs, deprives an accused of anything to which he [or she] has a legal right."). For some reason, however, the majority has chosen to reject this ubiquitous proposition, and in doing so, in my opinion, denigrates the fundamental nature of the right to acquire and possess legally obtained property.

{135} Thus, the majority holds, as no other court has held and as no Justice on the Supreme Court has advocated, that individuals have a constitutionally protected property right to the proceeds of the unlawful sale of illicit drugs.[4] Although the majority may be attempting to limit such a right to proceeds in drug cases by including "stolen property" within its definition of "contraband," *Majority Opinion,* ¶ 35, I disagree that a plausible distinction exists between drug money and stolen money because both are not possessed legally, both are the fruits of crime, and both, unlike contraband such as controlled substances, are not property which is inherently illegal. While it may be reasonable to conclude that the forfeiture of a vehicle as an instrumentality, which is legally acquired property that has merely been used in an illegal manner, is punishment, I believe it is a critical error to reach a similar conclusion regarding drug proceeds, which, unlike the vehicles at issue, were never legally acquired. The majority is allowing Chavez to negotiate, concede, and forfeit his drug profits and then to pick his punishment—$2529 rather than criminal charges which carry possible jail time, a true deprivation of his liberty interest. Because the only property taken from both Defendants Chavez and Gallegos was

---

Gallegos's crime. If the majority believes that Gallegos's money was legally acquired, then it is paradoxical that the forfeiture judgment is left intact by the majority's opinion.

4. Further, the majority, while recognizing that forfeiture involves a property interest, mistakenly refers to this interest as "one of the most fundamental liberty interests." *Majority Opinion,* ¶ 33,

¶ 75 ("We regard forfeiture with mistrust because it divests the individual of ... one of the most fundamental *liberty* interests.") (emphasis added). I believe the right to property is separate and distinct from the right to liberty. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

drug proceeds, currency to which neither had any legal right, I would reverse the district court's dismissal of Chavez's criminal charges and affirm Gallegos's criminal conviction.

## II. Default Judgments

{136} The majority also concludes that jeopardy attaches to a default judgment in a forfeiture proceeding. *See Majority Opinion*, ¶ 102 (asserting, without support, that because forfeiture is punitive that it is "absurd" and "nonsense" to conclude that default judgments do not violate double jeopardy). Respectfully, I disagree. A default judgment either renders the property "ownerless" or represents abandonment of the property by the owner. Even Justice Stevens recognized this fact in dismissing the majority's reliance in *Ursery* on the government's ability to summarily forfeit unclaimed property: "Property that is not claimed ... is considered abandoned; it proves nothing that the Government is able to forfeit property that *no one owns*." 518 U.S. at 312, 116 S.Ct. 2135 (Stevens, J., concurring in judgment in part and dissenting in part) (emphasis added). Other courts have reached a similar conclusion regarding default judgments. "If no one makes a claim to the property in a civil forfeiture proceeding, the property is then 'ownerless,' and, therefore, its forfeiture punishes no one." *State v. Selness*, 154 Or.App. 579, 962 P.2d 739, 742 (1998), *review allowed*, 328 Or. 418, 987 P.2d 511 (1999).

> [T]he most persuasive reason why a forfeiture that is based upon a default or failure to file a timely claim, does not bar a subsequent criminal prosecution, is that the defendant has either failed to assert an ownership interest in the first instance, or by failing to answer, has effectively abandoned any claim to the property.... Moreover, "[t]o hold otherwise, would allow criminal defendants to choose their punishment. *A criminal defendant could decide to forfeit material possessions in lieu of going to prison.*"

*People v. Prince*, 43 Cal.App.4th 1174, 51 Cal.Rptr.2d 138, 146 (1996) (emphasis added) (quoting *United States v. Walsh*, 873 F.Supp. 334, 337 (D.Ariz.1994)). This is apparently the successful strategy which Defendants Gallegos, Nunez, Edward Vasquez and Marguerite Vasquez employed.

{137} Under the Forfeiture Act, a contested forfeiture action could establish that a person other than the defendant is the actual owner of the property, and the property could still be subject to forfeiture if the owner knew that the property was used for illegal purposes, in which case the defendant could not legitimately claim any form of personal punishment regardless of whether the criminal defendant received notice of the proceeding. A contested forfeiture action could also establish a record from which it would be possible for an appellate court to review in a meaningful way a claim of double jeopardy. For example, in the case of Defendant Gallegos, he should at least have to appear at the proceeding to force the government to establish a record concerning the property's taint rather than force this Court, as the majority does, to presume, possibly inaccurately, that he told the truth about the source of his forfeited money. Without a contested claim, we should instead presume from the default judgment that the money *was* the fruit of a crime as shown by the government and that the property has been abandoned.

{138} Because a default judgment establishes that the property is either ownerless or abandoned, then there is no owner, including the defendant, who has been punished or put in jeopardy for purposes of the Double Jeopardy Clause. Defendants Nunez, Gallegos, Edward Vasquez and Marguerite Vasquez presumably forfeited instrumentalities and proceeds through default judgments, thereby abandoning their ownership of the property. Thus, I would conclude that these Defendants were not punished by the default proceedings and double jeopardy does not apply. I would reverse the dismissal of the criminal charges against Defendant Nunez, and affirm the convictions of Defendant Gallegos, Defendant Edward Vasquez, and Defendant Marguerite Vasquez.

## III. No Distinctive State Characteristics

{139} Under the *Gomez* standard, this Court departs from federal analysis because the federal analysis is flawed, because of

distinctive state characteristics, or because of undeveloped federal analogs. *Gomez*, 1997–NMSC–006, ¶ 20, 122 N.M. 777, 932 P.2d 1. The majority concludes that prior holdings of this Court represent a distinctive state characteristic. With respect, I disagree. The majority asserts that "New Mexico has a time-honored precedent that has always regarded forfeiture as punitive," that the constitutional provisions are facially different, that New Mexico's "double-jeopardy case law has departed from the federal standard," and that following *Ursery* would require "dismantl[ing] a significant body of settled law, much of which was decided independently of federal case law." *Majority Opinion*, ¶ 17.

## A. Previous Departure From Federal Law

{140} Most importantly, the majority's assertion that New Mexico has departed from the federal standard is misleading. In *Schwartz*, 120 N.M. at 625–26, 904 P.2d at 1050–51, this Court stated:

> The double jeopardy Clause "protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." Here we are concerned with the third of these protections, the protection against multiple punishments.

Both *Schwartz* and the present case involve double jeopardy claims arising out of criminal proceedings following civil proceedings. Thus, under *Schwartz*, this case involves multiple punishments, as the majority apparently agrees by applying the test derived from *Schwartz*.[5]

{141} In *Schwartz*, we held that, in respect to multiple punishments, "our analysis is identical for both the federal and state clause." *Id.* at 625, 904 P.2d at 1050. "We reserve[d] the question, however, whether the New Mexico Double Jeopardy Clause, under circumstances other than the multiple punishment doctrine, provides greater protection than the federal clause." *Id.* By

departing from federal law and holding that the Double Jeopardy Clause of the New Mexico Constitution provides broader protection in the multiple punishment context, the majority is deviating from, not following, this critical aspect of *Schwartz*. As support for this departure, the majority relies on *Breit*. However, because *Breit* involved prosecutorial misconduct in the context of multiple prosecutions rather than multiple punishments, *Breit* partially answers the question reserved in *Schwartz* and does not support the majority's departure from federal law in the specific context of multiple punishment. Indeed, as demonstrated by *Schwartz*, this Court has consistently declined to depart from federal law when addressing multiple punishment. "We find no suggestion ... in the reported New Mexico case law that the New Mexico double jeopardy clause, in the multiple punishment context, provides further protection than that afforded by the federal clause as interpreted by relevant federal case law." *Swafford*, 112 N.M. at 7 n. 3, 810 P.2d at 1227 n. 3.

{142} As noted above, I believe that the analysis in *Schwartz* summarizes federal law, and, in any event, as discussed below, the *Schwartz* test does not conflict with the analysis of *Ursery*. As in *State v. Woodruff*, 1997–NMSC–061, ¶¶ 16–19, 124 N.M. 388, 951 P.2d 605, when our cases rely on a federal analysis, a subsequent overruling of the federal analysis by the Supreme Court, as apparently the majority believes occurred with *Ursery*, does not render the earlier New Mexico cases "established precedent providing a basis for interpreting the New Mexico constitutional provision(s) more broadly than the federal analog(s)." *Id.* ¶ 15. Our cases have repeatedly declined to depart from the federal analysis on the multiple punishment prong of double jeopardy. *See Schwartz*, 120 N.M. at 625, 904 P.2d at 1050 ("Due to the similarity of the Federal and State Double Jeopardy Clauses, this Court consistently has construed and interpreted the state clause as providing the same protections offered by the federal clause."); *Swafford*, 112 N.M. at

---

5. As I discuss below, I believe the majority has merged the analysis and principles of successive

prosecution and multiple punishments.

13, 810 P.2d at 1233 ("Taking as our cue the repeated admonitions of the Supreme Court that the sole limitation on multiple punishments is legislative intent, we adopt today a two-part test for determining legislative intent to punish.") (citations omitted). In this case, as discussed further below, I believe there are distinctive state characteristics, specifically, our relatively narrow forfeiture statute, that argue against, not in favor, of departing from *Ursery*.

### B. Facial Distinctions Between the Federal and New Mexico Provisions are Irrelevant

{143} The majority asserts that the New Mexico Double Jeopardy Clause is facially different from the federal counterpart. *See Majority Opinion*, ¶¶ 24–27. However, the facially different language relates to successive criminal prosecutions and clearly does not apply to the present cases. *See* N.M. Const. art. II, § 15 (stating that "when the indictment, information or affidavit upon which any person is convicted charges different offenses or different degrees of the same offense and a new trial is granted the accused, he [or she] may not again be tried for an offense or degree of the offense greater than the one of which he [or she] was convicted."). This provision embodies the well-established principle that conviction of a lesser offense implies an acquittal of a greater offense, *see State v. Martinez*, 120 N.M. 677, 678–79, 905 P.2d 715, 716–17 (1995), and it does not concern the issue of multiple punishment in the cases before this Court. The majority also relies on Section 30–1–10, the non-waiver provision. Contrary to the majority's position, I do not believe that this statutory provision "expand[s]" the constitutional protection of double jeopardy. *See Majority Opinion*, ¶ 25. I believe this is a statutory right that would, similar to *Swafford*, protect defendants from multiple punishments not intended by the Legislature. I do not believe that the Legislature, by enacting this provision, intended to limit its own authority to enact separate punishments to be administered in separate proceedings that would otherwise be permissible under the Constitution. *See Montoya*, 55 F.3d at 1499

(stating that Section 30–1–10 is statutory rather than constitutional).

### C. Dismantling of New Mexico Precedent is Not Required

{144} The majority declares that New Mexico has a "time-honored precedent that has always regarded forfeiture as punitive." *Majority Opinion*, ¶ 17. There are multiple problems with this statement: (1) much of the older authority cited by the majority is clearly distinguishable; (2) more recent case law is dependent on federal law; and (3) even if the proposition were true, the test in *Schwartz* does not require this Court to hold that forfeiture violates double jeopardy.

{145} The majority states that "the presumption that forfeiture is punitive can be traced to the earliest opinions of the Territorial Supreme Court, prior to our statehood," *Majority Opinion*, ¶ 73, and relies on *United States v. Lucero*, 1 N.M. (Gild.) 422, 449 (1869). However, a careful read of *Lucero* reveals that this Court viewed in rem forfeiture that does not involve the regulation of trade, such as the present case, as *remedial* in nature, *not punitive*, in accordance with the United States Supreme Court's opinion in *Taylor v. United States*, 44 U.S. (3 How.) 197, 210, 11 L.Ed. 559 (1845) (opinion of Story, J.) ("In one sense, every law imposing a penalty or forfeiture may be deemed a penal law; in another sense, such laws are often deemed, *and truly deserve to be called, remedial*." (emphasis added)). Rather than rejecting the Supreme Court's position in *Taylor* that in rem forfeiture is remedial, this Court in *Lucero* merely distinguished *Taylor* because the statute at issue involved the regulation of trade. Beyond *Lucero*, the other cases relied upon by the majority only incidentally refer to punishment and forfeiture and therefore do not provide adequate support for the proposition in the opinion. Further, these cases arose in different contexts and could not have contemplated the narrow form of forfeiture permitted in Section 30–31–34 because that statute was not yet in existence.

{146} It is true that recent New Mexico cases have referred to forfeiture as being punitive in nature. However, none of these

cases discussed principles of double jeopardy; in fact, no New Mexico case has even alluded to a double jeopardy problem with forfeiture even though the statute has existed since 1972.[6] Rather, these cases largely stem from this Court's discussion of forfeiture in *Ozarek*, which was dependent on federal law concerning the right against self-incrimination and the exclusionary rule. *See Ozarek*, 91 N.M. at 276, 573 P.2d at 210 (relying on *Plymouth Sedan*, 380 U.S. at 700, 85 S.Ct. 1246). The Supreme Court, in *Ursery*, did not overrule those cases. Thus, *Ozarek* stands for the proposition that forfeiture is punitive for purposes of *some* procedural due process rights; however, *Ozarek* did not transform forfeiture into a truly criminal proceeding that would require such constitutional procedural protections as the right to confront witnesses and the requirement of proof beyond a reasonable doubt. The majority opinion similarly fails to designate a civil forfeiture proceeding as a fully criminal action by adopting a clear and convincing standard of proof rather than proof beyond a reasonable doubt as would be required in a criminal proceeding. Therefore, *Ozarek* and its progeny do not require the result reached by the majority in this case. *See State v. Catlett*, 133 Wash.2d 355, 945 P.2d 700, 704 (1997) (rejecting a defendant's argument that prior case law describing forfeiture as punitive and quasi-criminal required a conclusion that forfeiture was punishment for purposes of double jeopardy, because the prior case had addressed the exclusionary rule under the Fourth Amendment, had not addressed double jeopardy, and was therefore inapposite to the double jeopardy analysis).

{147} Finally, even if New Mexico has "time-honored" precedent noting that forfeiture is punitive, this conclusion is not dispositive under the *Schwartz* test. In *Schwartz*, this Court, relying on *Halper*, set forth the following test in determining, not merely whether a particular sanction has some punitive aspects, but whether the sanction is pun-

ishment for the specific purposes of double jeopardy: "If the penalty may be fairly characterized *only* as a deterrent or as retribution, then the revocation is punishment; if the penalty may be fairly characterized as remedial, then it is not punishment for the purposes of double jeopardy analysis." *Schwartz*, 120 N.M. at 630, 904 P.2d at 1055 (emphasis added); *accord State v. Hanson*, 543 N.W.2d 84, 87–88 (Minn.1996) (addressing the exact issue this Court addressed in *Schwartz* and concluding that, under *Halper*, a civil sanction is punishment for purposes of double jeopardy only if its purposes can be characterized as "solely deterrent/retributive"). Under this test, a particular penalty may have incidental punitive aspects and still be fairly characterized as remedial. *Id.* at 633, 904 P.2d at 1058 ("[T]he fact that the regulatory scheme has some incidental deterrent effect does not render the sanction punishment for the purposes of double jeopardy analysis."). Thus, in order to follow *Ursery*, this Court would not need to "dismantle" any New Mexico law.

## IV. The *Schwartz* Test is Not "Unique" to New Mexico

{148} The analysis ultimately adopted by the majority is actually strikingly similar to the *Ursery* test. This signifies to me that the test itself, though not necessarily its application, is not flawed under the majority's analysis.

{149} The test adopted in the opinion, taken from *Schwartz*, is

(1) whether the State subjected the defendant to separate proceedings; (2) whether the conduct precipitating the separate proceedings consisted of one offense or two offenses; and (3) whether the penalties in each of the proceedings may be considered "punishment" for the purposes of the Double Jeopardy Clause.

---

6. *Cf. Ursery*, 518 U.S. 267, 275, 116 S.Ct. 2135, 135 L.Ed.2d 549 ("For the *Various Items* Court to have held that the forfeiture was prohibited by the prior criminal proceeding would have been directly contrary to the common-law rule, and would have called into question the constitutionality of forfeiture statutes thought constitutional for over a century. *See United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 327–28, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (Evidence of a longstanding legislative practice 'goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice').").

*Schwartz,* 120 N.M. at 626, 904 P.2d at 1051. Although the majority asserts that the Supreme Court in *Ursery* "left unexpressed" and "discount[ed]" the first two factors in *Schwartz,* which the majority considers "indispensable," *Majority Opinion,* ¶ 38, a careful review of *Ursery* reveals that the Supreme Court was clearly aware of these factors and merely assumed their presence for purposes of the analysis under the third prong: whether the proceedings constitute punishment. *Ursery,* 518 U.S. at 273 n. 1, 116 S.Ct. 2135. I believe that the two-part test in *Ursery* actually represents an attempt to clarify the third prong articulated in *Schwartz,* whether the penalties in the two proceedings constitute punishment, and is very similar to the majority's analysis comparing the punitive and the remedial purposes of the statute. Thus, I am uncertain why the majority rejects the federal analysis in *Ursery;* it appears that the majority is merely rejecting the result in *Ursery.*

{150} The test to determine whether civil forfeiture constitutes punishment in *Ursery* is: (1) whether the legislative body intended to create a criminal punishment; and (2) if not, whether the statutory scheme was so punitive either in purpose or effect as to negate the legislative body's intention to establish a civil remedial mechanism. 518 U.S. at 277, 116 S.Ct. 2135. This test was derived from earlier cases and is consistent with, rather than a reversal of, the Court's recent double jeopardy jurisprudence. According to federal courts, for example, *Ursery* does not represent a "new rule of law" for purposes of applying its holding retroactively. *United States v. Emmons,* 107 F.3d 762, 765 (10th Cir.1997).

{151} The majority departs from *Ursery* in the rejection of *Ursery*'s requirement of the "clearest proof" that a statute is so punitive as to render the forfeiture proceedings essentially criminal in character.[7] The ma-

jority concludes that " 'clearest proof' is such an inaccessible standard that it requires the judiciary to suspend its own interpretation of the constitution in favor of that of the [L]egislature," and asserts that "[u]nlike federal courts, New Mexico courts have never used the expression 'clearest proof' as a standard for evaluating the legitimacy of forfeiture actions." *Majority Opinion,* ¶ 40. However, this rule in *Ursery* is derived from *89 Firearms,* which was cited in *Schwartz* with apparently no objection to its analysis. *See Schwartz,* 120 N.M. at 628, 904 P.2d at 1053. Nevertheless, the majority eschews this test and instead, without support, creates a presumption that a separate proceeding involving the deprivation of the "fundamental constitutional right of 'acquiring, possessing and protecting property,' " violates double jeopardy under the New Mexico Constitution. *See Majority Opinion,* ¶ 64 (stating that the purpose of depriving a defendant of property "creates a strong presumption that the sanction is punitive" and therefore unconstitutional). This analysis conflicts with existing New Mexico law that holds that defendants bear the burden of demonstrating a violation of double jeopardy. *See State v. Gonzales,* 1997–NMCA–039, ¶¶ 18–19, 123 N.M. 337, 940 P.2d 185. Additionally, the majority's analysis, hinging on the right to property, conflicts with this Court's opinion in *In re Nelson,* 79 N.M. 779, 450 P.2d 188 (1969) (per curiam), which was cited with approval in *Schwartz,* 120 N.M. at 631, 904 P.2d at 1056. In *Nelson,* this Court upheld the indefinite suspension of a license to practice law and, in addressing a due process claim, concluded that there was no due process violation because the suspension was for "the protection of the public, the profession, and the administration of justice, and not the punishment of the person disciplined." *Nelson,* 79 N.M. at 784, 450 P.2d at 193. Although a professional license is a recognized property right un-

---

7. One other significant difference in the analysis of the majority is the inexplicable rejection of reliance on legislative intent, the first prong of the *Ursery* test, even though this test would seem to expedite the punishment analysis used by the majority in some situations. *Cf. State v. Franco,* 257 Neb. 15, 594 N.W.2d 633 (1999) (concluding that the legislature's intent to make a forfei-

ture statute criminal necessitates application of double jeopardy without further inquiry). The majority characterizes *Ursery* as engaging in "almost complete reliance" on the legislative labeling of "civil" or "criminal." *Majority Opinion,* ¶ 39. Contrary to the majority's suggestion, however, this prong of the test does not cede judicial power to the legislative branch.

der the New Mexico Constitution, *Mills v. New Mexico Bd. of Psychologist Exam'rs*, 1997–NMSC–028, ¶ 14, 123 N.M. 421, 941 P.2d 502, this Court did not apply any presumption that the deprivation of that right constituted punishment. Thus, the majority's analysis is inconsistent with *Schwartz* and other New Mexico cases. Without support in New Mexico law, the majority appears to reject *Ursery*'s allegedly result-oriented approach to forfeiture in favor of another.

## V. The Forfeiture Statute is Not Sufficiently Punitive to Become Criminal in Nature

{152} The majority relies on *Schwartz* in order to determine whether a separate forfeiture proceeding violates double jeopardy. However, as stated above, the test in *Schwartz* determines whether a sanction may be fairly characterized as remedial. Additionally, *Halper*, on which *Schwartz* relied, stated that a civil sanction may be considered as punishment for purposes of double jeopardy only if it is "so extreme and so divorced from the Government's [remedial objective] as to constitute punishment." *Halper*, 490 U.S. at 442, 109 S.Ct. 1892. The majority, although claiming to apply this analysis, recasts the test and, without authority, presumes a sanction to be punitive *unless* its punitive aspects are "outweigh[ed]" by its remedial aspects. *Majority Opinion*, ¶ 66; *accord Majority Opinion*, ¶ 64 ("We also believe that if neither the remedial nor the punitive purposes predominate, the evaluation should be guided by whether the sanction affects a fundamental right."). I believe this test again violates our admonition that "double jeopardy should be an exceedingly uncommon remedy." *Breit*, 1996–NMSC–067, ¶ 35, 122 N.M. 655, 930 P.2d 792.[8]

{153} The majority states that one of the most compelling arguments supporting the conclusion that civil forfeitures are criminal is that they are conditioned on the commis-

sion of a crime. *Majority Opinion*, ¶ 91 ("The forfeiture necessarily requires proof of the criminal offense and by its terms compels the defendant to relinquish property right precisely because he or she has committed a crime."). In addition, the majority states that the innocent owner provision supports this conclusion. I disagree. An owner's property can be subject to forfeiture even though that owner did not commit a crime. Section 30–31–34(G)(2) states that "no conveyance is subject to forfeiture under this section by reason of any act or omission established for the owner to have been committed or omitted without his [or her] knowledge or consent." Thus, the forfeiture statute only requires the state to prove that the owner knew or consented to the use of his or her conveyance by an individual violating the Controlled Substances Act, not that the owner, himself or herself, violated the Controlled Substances Act, either by possessing or distributing controlled substances. This supports the conclusion in *Ursery* that forfeiture "encourages property owners to take care in managing their property and ensures that they will not permit that property to be used for illegal purposes," thereby reinforcing the remedial objectives of the statute. 518 U.S. at 290, 116 S.Ct. 2135; *id.* at 294, 116 S.Ct. 2135 (Kennedy, J., concurring) ("The key distinction is that the instrumentality-forfeiture statutes are not directed at those who carry out the crimes, but at owners who are culpable for the criminal misuse of the property.").

{154} The opinion holds that forfeiture is "the most extreme sanction the state can bring against the property owner." *Majority Opinion*, ¶ 75 (" 'Forfeiture is to fines what capital punishment is to incarceration.' " (quoting Cheh, *Easy, supra*, at 10)). The statutory criminal fines for the activities at issue range from $5000 to $15,000, while the value of the forfeitures in the present case range from $39 to $2179 or a 1989 Chevy pickup. Thus, the value of the forfeit-

---

**8.** The holding in *Halper* "does not authorize courts to undertake a broad inquiry into the subjective purposes that may be thought to lie behind a given judicial proceeding. Such an inquiry would be amorphous and speculative, and would mire the court in the quagmire of differentiating among the multiple purposes that underlie every proceeding, whether it be civil or criminal in name." *Halper*, 490 U.S. at 453, 109 S.Ct. 1892 (Kennedy, J., concurring) (citation omitted).

ed items in these cases does not appear to exceed the criminal fines possible, and in fact was often substantially lower, whereas obviously, capital punishment is always more severe than any amount of incarceration.

{155} Importantly, the majority, by relying so heavily on commentators, incorrectly analogizes the New Mexico forfeiture statute to modern federal law. *Compare* Section 30–31–34, *with* 21 U.S.C. § 881 (1994 & Supp. II 1996). As alluded to above, a reading of the federal counterpart reveals a clear difference, which in fact served as the basis of Justice Stevens' dissent in *Ursery:* "The following shall be subject to forfeiture to the United States and no property right shall exist in them: ... *All real property,* including any right, title, and interest ... in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment ...." 21 U.S.C. § 881(a)(7) (emphasis added). While the opinion attempts to characterize forfeiture in New Mexico as extremely broad and far reaching, New Mexico's statute is actually much narrower than the federal counterpart, which allows forfeiture of any property, including a residence and land. New Mexico's statute is limited to contraband, paraphernalia, containers, conveyances, and cash proceeds. Thus, under New Mexico law, real property, even if purchased with drug proceeds, can never be subject to forfeiture. The majority's reliance on commentators' analysis of the much-broader federal forfeiture law demonstrates the problematic tendency towards theory, rather than reasoning based on the facts before the Court.

{156} Further, with respect to the types of property articulated in the statute, the forfeiture of conveyances is limited to the most extreme drug crimes, trafficking and distribution, which are second, third, and fourth degree felonies. As a result, the statute is, contrary to the opinion's conclusion otherwise, tied to the seriousness of the crime. Thus, the narrow nature of New Mexico's statute does not call for the majority's departure from federal law, and in fact

may have even been acceptable to Justice Stevens. Justice Stevens emphasized that his disagreement with the majority opinion in *Ursery* was largely founded on the forfeiture of a house, and in fact noted that the early cases relied on by the majority "involved the forfeiture of vessels whose entire mission was unlawful and on the Prohibition-era precedent sustaining the forfeiture of a distillery .... Notably none of those early cases involved the forfeiture of a home as a form of punishment for misconduct that occurred therein." *Ursery,* 518 U.S. at 320–21, 116 S.Ct. 2135 (Stevens, J., concurring in judgment in part and dissenting in part); *see also id.* at 300 n. 3, 116 S.Ct. 2135 (discussing the "unusual scope and the novelty of" 21 U.S.C. § 881(a)(7)).

## VI. Forfeiture in New Mexico May Be Fairly Characterized as Remedial

{157} Applying the *Schwartz* test, I believe that the forfeiture statute can neither be characterized "only as a deterrent or as retribution," *Schwartz,* 120 N.M. at 630, 904 P.2d at 1055, nor as "so extreme and so divorced" from the government's remedial objectives that it may be characterized as criminal. The majority argues that forfeiture is punishment because it is not related to the amount of damages suffered by the State concerning the illegal drug trade. However, I believe this overlooks one of the most important remedial purposes of forfeiture: The primary purpose of forfeiture is to remove the means of committing the crime. *See Albuquerque Police Dep't v. Martinez (In re Forfeiture of Fourteen Thousand Six Hundred Thirty Nine Dollars),* 120 N.M. 408, 902 P.2d 563 (Ct.App.1995) (stating that the purpose of forfeiture of instrumentalities "is to prevent their use in the commission of subsequent offenses involving transportation or concealment of controlled substances and to deprive the drug trafficker of needed mobility" (quoting the comment to Uniform Controlled Substances Act § 505, 9 U.L.A. 835 (1988))). Indeed, although *Halper* only contemplated that a sanction be "rationally related" to remedial objectives, *Halper,* 490 U.S. at 451, 109 S.Ct. 1892, New Mexico's statute is narrowly tailored to serve this goal by targeting property owners who know or

consent to the drug crime, making the future misuse of their property more likely. In addressing the argument that the forfeiture of instrumentalities "is justified as a way of protecting society from harm," the majority concedes that the "[f]orfeiture of harmful property can be beneficial." *Majority Opinion*, ¶ 69. Further, unlike *Kurth Ranch*, 511 U.S. at 782, 114 S.Ct. 1937, where "the legitimate revenue-raising purpose that might support ... a [drug] tax could be equally well served by increasing the fine imposed upon conviction," the State in this case cannot achieve this remedial aim by increasing the criminal penalties. Increasing criminal penalties under the Controlled Substances Act would not have the desired effect of removing instrumentalities from the drug trade and would not reach "innocent" owners who knowingly allow their property to be used for the purpose of selling illegal drugs, but do not themselves violate the Act. With this statutory purpose in mind, I disagree with the majority that forfeiture in New Mexico constitutes punishment for purposes of double jeopardy under *Schwartz* because the forfeiture statute may be fairly characterized as remedial.

## VII. Advisory Conclusions Concerning Due Process

### A. Right to Counsel

{158} The majority opinion contains several holdings which appear to me to be advisory. The majority attempts to create a right to counsel in the second part of a single, bifurcated proceeding which would resolve forfeiture disputes following a criminal trial.[9] *See Majority Opinion*, ¶ 104 ("Most notably, the indigent defendant will have available the assistance of counsel in the forfeiture proceeding because both the property and the criminal actions will take place in a single trial."). The majority apparently does so on the basis of due process, but without any form of due process analysis. *See Majority Opinion*, ¶ 104 (discussing

"fairness"). This Court recently concluded that a sentence enhancement based on a prior misdemeanor conviction not resulting in a term of imprisonment obtained without counsel does not violate the New Mexico or federal constitutions. *See Woodruff*, 1997-NMSC–061, ¶ 37, 124 N.M. 388, 951 P.2d 605. Although we left unaddressed the specific question of whether actual imprisonment or a designated term of potential imprisonment triggers the right to counsel in misdemeanor cases under the New Mexico Constitution, *see id.* ¶ 25 n. 3, it is significant that no court has interpreted either a state or federal constitutional right to counsel to apply outside the context of actual or potential incarceration, aside from a limited number of cases involving the termination of parental rights. To now imply that counsel is required in a civil proceeding seems inconsistent at best and would call into question countless heretofore constitutionally-obtained misdemeanor convictions. The majority references no authority for the proposition that counsel must be provided for civil proceedings. Defending against a civil forfeiture in New Mexico is far less onerous than defending oneself against criminal charges, with much less at stake. Further, because this availability of counsel depends on the criminal trial preceding the forfeiture, and no counsel is thus required under the majority opinion for individuals facing only forfeiture, equal protection concerns arise. Additionally, the majority's reference to counsel raises questions of whether a bifurcated proceeding requires a jury to remain for the forfeiture portion. In my view, neither the right to counsel nor the right to due process in the New Mexico Constitution would require state-provided counsel or a right to a trial by jury in a forfeiture proceeding, whether bifurcated with a criminal proceeding or not.

### B. Burden of Proof

{159} The majority concludes "that the State bears a low burden of proof ... when it initiates the deprivation of a fundamental

---

9. This holding also appears to be internally inconsistent. *See Majority Opinion*, ¶ 109 (noting the State's advantages in a forfeiture, and stating that "because forfeitures are nominally civil proceedings, protections that are indispensable in a criminal setting—such as proof beyond a reasonable doubt, the right to counsel, presumption of innocence, the right to confront one's accusers—are not guaranteed").

constitutional right [which] raises grave due process concerns." *Majority Opinion*, ¶ 108. The majority cites Section 30–31–37 as support for this conclusion. However, because this Court strictly construes the forfeiture statute, I believe this is an incorrect interpretation of the statute. Section 30–31–37 relieves the State of its obligation to "negate any exemption or exception in the Controlled Substances Act.... The burden of proof of any exemption or exception is upon the person claiming it." This statute does not remove the State's obligation to prove the affirmative requirements within the forfeiture statute itself that the property was involved in a drug transaction. *Cf. Ursery*, 518 U.S. at 299 n. 1, 116 S.Ct. 2135 (Stevens, J., concurring and dissenting) ("To justify [the] forfeiture, the Government assumed the burden of proving (a) that respondent had committed such an offense, and (b) that the property had played some part in it."). Further, with respect to the innocent owner exception, and despite the wording of the Section 30–31–37, this Court has held "that the burden imposed on the owner is the burden of going forward and not the burden of persuasion." *Ozarek*, 91 N.M. at 276, 573 P.2d at 210 ("The owner need only assert that the vehicle was used without his [or her] knowledge and consent to shift the burden to the State.").

{160} The majority holds that, "in the forfeiture portion of the trial, the burden of proof will be on the State to prove by clear and convincing evidence that the property in question is subject to forfeiture." *Majority Opinion*, ¶ 110. Inexplicably, the majority also states that the burden of proof in Section 30–31–37 may not always be unconstitutional. *See Majority Opinion*, ¶ 111 ("[Section 30–31–37] may still apply in a solitary forfeiture action that involves no criminal prosecution."). This peculiar reasoning also seems to raise grave equal protection concerns. Apparently, although the majority concludes that forfeiture of property, a fundamental constitutional right, is punishment if one is also criminally prosecuted, when the State institutes only forfeiture proceedings, it is not punishment for purposes of invoking due process protections such as a heightened burden of proof.

{161} Further, the majority is apparently basing its declaration of the unconstitutionality of the standard of proof under the Controlled Substances Act on the Due Process Clause. However, despite the alleged unconstitutionality of the statute, the majority does not disturb the outstanding forfeiture judgments against these defendants. Clearly, the majority could not due so, because the forfeiture judgments, not having been appealed by these defendants, are not subject to the Court's review. This additionally illustrates the advisory nature of this aspect of the majority's opinion.

## VIII. Single Offense

{162} The majority determines that the crime of distribution or trafficking of controlled substances and the forfeiture of proceeds or instrumentalities constitutes a single offense. Specifically, the majority "conclude[s] that an examination of the Controlled Substances Act reveals that there is no fact needed to prove the drug trafficking violation that is not also needed to prove the grounds for forfeiture," thus, "[t]he forfeiture statute entirely subsumes the criminal offense." *Majority Opinion*, ¶ 57. In order to reach this result, the majority applies the federal test from *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180.

{163} This Court previously applied *Blockburger* to a similar question in *Schwartz*, and as previously discussed, *Schwartz* addressed an analogous double jeopardy issue by applying federal law instead of state constitutional law. Indeed, the Court of Appeals, in *State v. Powers*, 1998–NMCA–133, ¶¶ 21–29, 126 N.M. 114, 967 P.2d 454, recently discussed, in the context of successive prosecutions, whether the *Blockburger* "same elements" test sufficiently protects the right against double jeopardy under the New Mexico Constitution. In *Powers*, the Court of Appeals held that the "same elements" test from *Blockburger* "adequately protects Defendant's right to be free from double jeopardy in the context of successive prosecutions governed by our state constitution." *Powers*, 1998–NMCA–133, ¶ 29, 126 N.M. 114, 967 P.2d 454. The majority in this

case does not overrule *Powers,* and as the interstitial approach from *Gomez* would require, the majority fails to indicate that present federal law on this particular question is inadequate to protect Defendants' rights in this case. In fact, the majority concedes that the United States Supreme Court, in *Ursery,* failed to address the issue of whether a forfeiture and a drug crime constitute a single offense for purposes of double jeopardy. *Majority Opinion,* ¶ 38. Thus, notwithstanding the majority's generalized claim of exclusive reliance on state constitutional law, *Majority Opinion,* ¶ 18, the majority is clearly applying federal law to this particular factor of the *Schwartz* test. *See Michigan v. Long,* 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) ("[W]hen ... a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."). Thus, under the interstitial approach of *Gomez,* the majority's departure from federal law is therefore limited to the third factor of the *Schwartz* test: whether forfeiture constitutes punishment for purposes of double jeopardy.

{164} On the question of whether forfeitures under Section 30–31–34 and criminal convictions under Sections 30–31–20, –22, constitute a single offense for purposes of double jeopardy, I believe the majority misapplies federal law and misinterprets the statutory provisions under the Controlled Substances Act. The majority asserts that the innocent owner provisions support the conclusion that a single offense is at issue because these provisions "limit the application of the forfeiture statute exclusively to those who are in 'violation of the Controlled Substances Act.' " *Id.* (quoting Section 30–31–34(G)(1)). I disagree because I believe the innocent owner provision reveals the distinct elements required for forfeiture as compared to the elements required for the crime of distribution or trafficking controlled substances. The plain language of the forfeiture statute states that a common carrier is not subject to the forfeiture of a conveyance "unless it appears that the owner ... is *a consenting party or privy to* a violation of the Controlled Substances Act," Section 30–31–34(G)(1), and that other owners' conveyances are not subject to forfeiture unless the owner knows or consents to the drug crime, Section 30–31–34(G)(2). As a result, forfeiture of an instrumentality has the following elements: (1) the subject property is a conveyance; (2) it was "used or intended for use to transport or in any manner facilitate the transportation for the purpose of sale of" controlled substances, Section 30–31–34(D); and (3) the owner of the subject property knew or consented to such use, Section 30–31–34(G)(2). By contrast, the crime of possession of a controlled substance with intent to distribute or traffic has different elements: (1) the defendant had a controlled substance; (2) the defendant knew it was a controlled substance; and (3) the defendant intended to transfer it to another. *See* UJI 14–3104 NMRA 1999; UJI 14–3111 NMRA 1999. Thus, the forfeiture of an instrumentality requires proof of the distinct element of the use of a conveyance to transport a controlled substance, whereas the crime of possession with intent to distribute requires proof of a higher level of a culpable mental state on the part of the owner/defendant, an intention to transfer the controlled substance. "If either information requires the proof of facts to support a conviction which the other does not, the offenses are not the same and a plea of double jeopardy is unavailing." *Owens v. Abram,* 58 N.M. 682, 684, 274 P.2d 630, 631 (1954), *cited with approval in State v. Tanton,* 88 N.M. 333, 335, 540 P.2d 813, 815 (1975).

{165} By way of illustration, it is useful to consider the facts relating to Defendant Marguerite Vasquez. Marguerite was arrested while driving a vehicle registered in her name and later forfeited to the government. Her husband, Edward Vasquez, was a passenger in the car. The police seized roughly two kilograms of marijuana, 123 grams of cocaine, and currency in the amount of approximately seventy-nine dollars. At trial on his criminal charges, Edward claimed that the drugs were his, that

his wife knew nothing about them, and that they were for his personal use. In order to forfeit Marguerite's proportionate interest in the vehicle, assuming it was community property, the government had the burden to prove by a preponderance of evidence that *Edward Vasquez* used the vehicle for transporting the controlled substance for the purpose of sale and that *Marguerite Vasquez* knew or consented to that use. By contrast, in order to prosecute her for possession with intent to distribute, the State needed to prove beyond a reasonable doubt that *Marguerite* had a higher level of mental culpability, that she intended to sell the controlled substances. In other words, assuming they had challenged the forfeiture and asserted an ownership interest in the property, the government needed to refute Edward Vasquez's assertions that Marguerite did not know about the drugs and that they were for personal use in order to meet its burden in the forfeiture action, but it did not need to refute his assertion that the drugs were his and not Marguerite's until it chose to prosecute Marguerite for the criminal offense. This difference in elements further underscores the above-stated difference in purposes for these statutes: the forfeiture of a conveyance is directed at an owner of property, irrespective of the owner's commission of a crime, in order to prevent the future misuse of the property, whereas the crime of possession with intent to distribute, being directed only at criminal offenders, serves only the criminal law interests of deterrence and retribution. Under the *Blockburger* same elements test, then, each "offense" requires proof of a fact that the other does not. *Cf. Tanton*, 88 N.M. at 335, 540 P.2d at 815 ("The facts offered in municipal court to support a conviction for driving while under the influence of intoxicating liquors would not necessarily sustain a conviction for homicide by vehicle in the district court.").[10] Therefore, even if the majority were correct that forfeiture is punishment under the New Mexico Constitution, there can be no viola-

tion of double jeopardy because these were separate offenses. *Cf. State v. Clark*, 124 Wash.2d 90, 875 P.2d 613, 616, 618 (1994) (concluding, under *Austin*, that forfeiture is punishment for purposes of the Double Jeopardy Clause in the United States Constitution, but declining to hold that double jeopardy had been violated because the defendant had failed to demonstrate that the forfeiture and the crime were single offenses), *overruled by Catlett*, 945 P.2d at 703–06 (overruling *Clark* concerning the issue of punishment based on *Ursery* and concluding, under an independent state constitutional analysis, that forfeiture is not punishment for purposes of double jeopardy under the Washington Constitution).

## IX. Retroactivity

{166} Following the emphasis the majority places upon the forfeiture of instrumentalities and proceeds, *see Majority Opinion*, ¶ 75 ("But with regard to that car or cash, and the fundamental right of ownership, no penalty is more extreme than stripping a person of that right without compensation."), and the double jeopardy protection of the New Mexico Constitution, *see Majority Opinion*, ¶ 27 ("When compared to recent United States Supreme Court Fifth–Amendment jurisprudence, New Mexico's constitutional and statutory protection against double jeopardy, on its face, is of a different nature, more encompassing and inviolate."), the majority then places arbitrary limits upon those defendants who have allegedly suffered the violation by restricting the retroactivity of the holding. *See Majority Opinion*, ¶ 116. Although the majority claims that the holding is the inevitable result of New Mexico law, dating back to territorial days, the majority reaches a contradictory conclusion by holding that forfeiture as punishment is a "new rule of law" which, if applied to forfeiture cases dating back to 1972, would "have a deleterious 'effect upon the administration of justice.'" *Majority Opinion*, ¶ 116 (citation omitted). If precedent required the result

---

10. Of course, the fact that the majority is willing to consider the forfeiture even though it was obtained pursuant to a default judgment requires a somewhat hypothetical approach to this issue. In any event, we clarified in *Owens* that a viola-

tion of double jeopardy occurs only when the second prosecution is for the same act and crime both in law and fact as the first prosecution. 58 N.M. at 684, 274 P.2d at 631–32.

advanced by the majority, as the majority claims it does, then this case would not represent a "new rule of law" and the *Santillanes* retroactivity analysis would be inapposite.[11] *See Santillanes*, 115 N.M. at 223, 849 P.2d at 366 ("The issue of retroactive effect arises only when a court's decision overturns prior case law or makes new law when law enforcement officials have relied on the prior state of the law.").

## X. Successive Prosecution Versus Multiple Punishment

{167} The majority criticizes the United States Supreme Court for not "addressing whether the cases in question are multiple punishment or multiple prosecution cases." *Majority Opinion*, ¶ 38. I believe this insight by the majority is highly significant and, if explored, could substantially clarify double jeopardy law. Unfortunately, however, the majority opinion suffers from the exact deficiency that it places on the Court's opinion in *Ursery*. The majority opinion relies heavily on the analysis of this Court in *Schwartz*. In *Schwartz*, we determined that the issue presented by the appeal was one of multiple punishment. Indeed, the three-part test from *Schwartz* that is used by the majority can only be directed at multiple punishment and could not be construed as a true successive prosecution inquiry. The third part of the test considers "whether the penalties in each of the proceedings may be considered 'punishment' for the purposes of the Double Jeopardy Clause." *Schwartz*, 120 N.M. at 626, 904 P.2d at 1051. By contrast, for successive prosecution cases, courts assess whether the defendant was subjected to more than one criminal prosecution for a single offense. Thus, under a true successive

prosecution inquiry, the issue of multiple punishment would be irrelevant; it would be a violation of double jeopardy to subject a defendant to multiple prosecutions regardless of whether an earlier prosecution resulted in acquittal, and therefore no punishment, or conviction, and therefore punishment. The harm the defendant suffers is the proceeding itself, regardless of the outcome.

{168} Although *Schwartz* and the majority's reliance on that case should make clear that the majority opinion treats this issue as one of multiple punishment, the majority opinion itself demonstrates some confusion on this issue. *Majority Opinion*, ¶ 30 ("The protection against *multiple prosecutions of the same offense* is not dependent upon whether jeopardy first attached in the criminal or civil proceeding."). Under the heading of "New Mexico multiple prosecutions test," the majority refers to the "multiple punishment analysis" of *Schwartz*, *Majority Opinion*, ¶ 36, but then discusses the application of this test as "indispensable in evaluating a multiple prosecution double-jeopardy claim." ¶ 38. The majority contends that "[i]f we conclude, under *Schwartz*, that these are separate proceedings seeking separate punishments for a single offense, there is no question that the prohibition against multiple prosecutions has been violated." *Majority Opinion*, ¶ 38. I believe this confusion between multiple punishment and multiple prosecution cases, which finds its genesis in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), and was perpetuated in *Halper*, represents a fundamental flaw in the majority's opinion.

{169} We stated in *Swafford*, 112 N.M. at 7, 810 P.2d at 1227:

---

11. I agree that this case should not be applied retrospectively, but for a different reason. I believe that the anti-waiver statute applies only to violations of the statutory protection of double jeopardy and not to constitutional claims. Indeed, under Article III, Section 1 of the New Mexico Constitution, the legislative branch does not create rules of preservation with respect to constitutional rights, or generally for that matter, and to the extent that Section 30–1–10 conflicts with Rule 12–216, it would have to be declared unconstitutional. *See Southwest Community Health Servs. v. Smith*, 107 N.M. 196, 755 P.2d 40 (1988) ("Pleading, practice and procedure are

of the essence of judicial power.... [A]ny conflict between court rules and statutes that related to procedure are today resolved by this Court in favor of the rules."). *See generally Gomez*, 1997–NMSC–006, ¶ 14, 122 N.M. 777, 932 P.2d 1, (characterizing the preservation requirement in Rule 12–216 as a rule of appellate practice and procedure). Thus, in order to interpret the statute in a manner that would not render it unconstitutional, I believe that Section 30–1–10 stands for the proposition that double jeopardy is a fundamental right within the meaning of Rule 12–216(B).

The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him [or her] to embarrassment, expense and ordeal and compelling him [or her] to live in a continuing state of anxiety and insecurity.... Multiple prosecutions also give the State an opportunity to rehearse its presentation of proof, thus increasing the risk of an erroneous conviction for one or more of the same offenses charged.

(Quotation marks and citation omitted). The separate forfeiture proceedings in these cases violates none of the interests protected by the successive prosecution prong of double jeopardy. First, the forfeiture proceeding cannot be considered a true criminal prosecution. Further, as in *Powers*, the fact that different governmental agencies pursue the forfeiture action and the criminal prosecution "severely limit[s] the extent to which the [forfeiture proceeding] could be used by the State as an opportunity to rehearse its trial strategy for the subsequent felony charges." *Powers*, 1998–NMCA–133, ¶ 28, 126 N.M. 114, 967 P.2d 454. Additionally, the statute clearly provides for separate proceedings and clearly contemplates both a forfeiture sanction and a criminal sanction. Because the State criminally charged Defendants in these cases prior to the entry of the forfeiture judgments, the time at which jeopardy attached according to the majority, Defendants "could not reasonably expect that the [forfeiture proceeding] would relieve [them] of any further obligation to answer in court" for the criminal charges. *Powers*, 1998–NMCA–133, ¶ 27, 126 N.M. 114, 967 P.2d 454. Similarly, because the singular goal of the double jeopardy prohibition against multiple punishment is to "prevent the sentencing court from prescribing greater punishment than the legislature intended," *Swafford*, 112 N.M. at 7, 810 P.2d at 1227 (internal quotation marks and citations omitted), the Legislature's clear indication that forfeiture is complementary to criminal sanctions abates any concern regarding this prong of double jeopardy. Due to the ab-

sence of any violation of these interests traditionally thought to be protected by double jeopardy, I do not believe that the Double Jeopardy Clause was ever intended to reach the type of situation at issue in this case, referred to as "successive punishments" in *Kurth Ranch. See Hess,* 317 U.S. at 554–56, 63 S.Ct. 379 (Frankfurter, J., concurring).

## XI. Conclusions

{170} The majority holds that New Mexico law has distinctive characteristics which warrant departure from federal analysis. However, the test in the majority's opinion is rather similar to the federal approach; it simply reaches a different result with a substantially similar analysis, a result which is extremely broad, unsupported by authority, and in fact contradicted by *all* nine Justices of the Supreme Court. Even the authors of the numerous law review articles upon which the majority relies do not support the majority's holding that drug proceeds are protected as a constitutional property interest.

{171} The present cases warrant neither a radical departure from *Ursery* nor a conclusion that these cases involve punishment for purposes of the Double Jeopardy Clause. Even if the majority's decision to depart from *Ursery* were appropriate, there is insufficient justification to hold that proceeds of criminal activity are a constitutionally protected property interest. Further, I believe that even if a forfeiture action is punishment for purposes of double jeopardy, a default judgment does not constitute punishment because the property is ownerless or abandoned. All of the consolidated cases before this Court could have been completely resolved by these two issues alone. Beyond these issues, I conclude that, under either the *Ursery* or *Schwartz* tests, the forfeiture statute, both in purpose and in effect in these cases, is remedial and not sufficiently punitive to transform the proceeding from civil to criminal in character for purposes of the Double Jeopardy Clause.

{172} I therefore, respectfully, **DISSENT**.

BACA, J., concurs.

## XV. APPENDIX: ENDNOTES

1. *See Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) ("[A] State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards."); *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) ("Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so.").

2. *See, e.g., Gomez,* 1997–NMSC–006, ¶¶ 33–40, 122 N.M. 777, 932 P.2d 1 (interpreting N.M. Const. art. II, § 10; holding that state must show exigent circumstances to justify warrantless search of automobile; contrary to *United States v. Ross,* 456 U.S. 798, 800, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)); *Breit,* 1996–NMSC–067, ¶¶ 19–24, 32–36, 122 N.M. 655, 930 P.2d 792 (interpreting N.M. Const. art. II, § 15; holding that jeopardy attaches at trial when prosecutorial misconduct is prejudicial to defendant, when prosecutor knows the conduct is improper but acts either with intent to provoke a mistrial or with willful disregard of the consequences of the conduct; contrary to *Oregon v. Kennedy,* 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)); *Campos v. State,* 117 N.M. 155, 158–59, 870 P.2d 117, 120–21 (1994) (interpreting N.M. Const. art. II, § 10; holding that warrantless arrest must be based on probable cause and exigent circumstances; contrary to *United States v. Watson,* 423 U.S. 411, 423, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)); *State v. Attaway,* 117 N.M. 141, 151–52, 870 P.2d 103, 113–14 (1994) (interpreting N.M. Const. art. II, § 10; establishing, on state constitutional grounds, knock-and-announce rule for entry to execute warrant, prior to similar interpretation of federal constitution in *Wilson v. Arkansas,* 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)); *State v. Gutierrez,* 116 N.M. 431, 432, 863 P.2d 1052, 1053 (1993) (interpreting N.M. Const. art. II, § 10; holding that good-faith exception in *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is incompatible with the warrant guarantees of the New Mexico Constitution);

*State v. Cordova,* 109 N.M. 211, 217, 784 P.2d 30, 36 (1989) (interpreting N.M. Const. art. II, § 10; holding that New Mexico would retain two-pronged test for probable cause established in *Aguilar v. Texas,* 378 U.S. 108, 114–15, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 412–13, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), contrary to *Illinois v. Gates,* 462 U.S. 213, 230–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), which abrogated both *Aguilar* and *Spinelli* ).

3. We base our holding today only on the unique characteristics of New Mexico's double-jeopardy jurisprudence.

4. *See, e.g., State ex rel. Schwartz v. Kennedy,* 120 N.M. 619, 634, 904 P.2d 1044, 1059 (1995) (stating forfeitures are punitive); *Mitchell v. City of Farmington Police Dep't (In re Forfeiture of Two Thousand Seven Hundred Thirty Dollars & No Cents),* 111 N.M. 746, 749, 809 P.2d 1274, 1277 (1991) [hereinafter *$2730.00* ] (stating that forfeitures under Controlled Substances Act are penal and are gauged by standards applicable to criminal proceedings).

5. *See, e.g., Ricketts v. Adamson,* 483 U.S. 1, 11, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (federal double jeopardy is subject to knowing and intelligent waiver); *Montoya v. New Mexico,* 55 F.3d 1496, 1499 (10th Cir.1995) (defendant may waive double-jeopardy defense by means of plea agreement). *But see State v. Jackson,* 116 N.M. 130, 133, 860 P.2d 772, 775 (Ct.App.1993) ("Being bound by the broad, clear language of Section 30–1–10, we reject any argument that Defendant successfully waived his double-jeopardy claim at the plea hearing.").

6. *State v. James,* 93 N.M. 605, 606, 603 P.2d 715, 716 (1979); *State v. Archuleta,* 112 N.M. 55, 58, 811 P.2d 88, 91 (Ct.App.1991).

7. *See Gordon v. Eighth Judicial Dist. Court,* 112 Nev. 216, 913 P.2d 240, 243 (1996); *see also* Stanley E. Cox, *Halper's Continuing Double Jeopardy Implications: A Thorn By Any Other Name Would Prick as Deep,* 39 St. Louis U. L.J. 1235, 1253 (1995).

8. Cheh, *Easy, supra,* at 14; Mary M. Cheh, *Constitutional Limits on Using Civil Remedies to Achieve Criminal Law Objec-*

*tives: Understanding and Transcending the Criminal–Civil Law Distinction,* 42 Hastings L.J. 1325, 1341 (1991) [hereinafter Cheh, *Constitutional* ].

9. *See* Andrew J. Gottman, Note, *Fair Notice, Even for Terrorists: Timothy McVeigh and a New Standard for the ex Post Facto Clause,* 56 Wash. & Lee L.Rev. 591, 646 (1999) (suggesting that the "clearest proof" standard allows for manipulation by the courts because a court can always claim that there is no clear proof that a statute has a punitive effect as long as there is even a single factor that indicates a remedial effect); Leading Case, *Double Jeopardy Clause—In Rem Civil Forfeiture,* 110 Harv. L.Rev. 206, 210 n. 54 (1996) ("[T]he Court's 'clearest proof' rule, devoid of guidance as to the necessary showing, fails *to* protect defendants adequately."); Brand, *supra,* at 302–03 ("The sweeping determination that civil forfeitures are non-punitive precludes any further inquiry into double jeopardy considerations in such cases, thus leaving no room for consideration of the Double Jeopardy Clause's 'humane' objectives.").

10. *See, e.g., In re 1982 Honda,* 681 A.2d 1035, 1038 (Del.1996) (using *Ursery* to conclude that Delaware forfeiture statute is not criminal and does not punish); *State v. Kienast,* 553 N.W.2d 254, 256 (S.D.1996) (same regarding South Dakota forfeiture statute); Sean M. Dunn, Note, *United States v. Ursery: Drug Offenders Forfeit Their Fifth Amendment Rights,* 46 Am. U.L.Rev. 1207, 1240 (1997) ("Because the Court in *Ursery* held that civil forfeitures pursuant to § 881 do not constitute punishment for double jeopardy purposes, it is likely that individuals facing drug charges now will be forced to defend themselves in two separate proceedings."); Jennifer B. Hendren, *Annual Survey of Caselaw: Criminal Law,* 19 U. Ark. Little Rock L.J. 707, 711 (1997) (*"Ursery* may be read as adopting the view that no in rem forfeiture would implicate the Double Jeopardy Clause.").

11. *See Swafford,* 112 N.M. at 9, 810 P.2d at 1229 ("[T]he question of whether punishments are unconstitutionally multiple depends on whether the legislature has authorized multiple punishment.").

12. *See Halper,* 490 U.S. at 449, 109 S.Ct. 1892 (rough justice); *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 237, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972) (liquidated damages).

13. *See Emerald,* 409 U.S. at 237, 93 S.Ct. 489 (Civil forfeiture "prevents forbidden merchandise from circulating in the United States."); Leach & Malcolm, *supra,* at 260 n. 81 ("Forfeiture is remedial because it protects the community by removing dangerous instrumentalities from the stream of commerce . . . .").

14. *See, e.g., Bennis v. Michigan,* 516 U.S. 442, 447–53, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996) (upholding the forfeiture of a car owned jointly by a married couple which was used by the husband in his illegal activity with a prostitute, despite wife's innocence of any crime); *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 665, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (upholding the forfeiture of a yacht leased to two individuals who brought a marijuana cigarette on board although the owner had no prior knowledge that the yacht would be wrongfully used); *United States v. Sixty Acres,* 930 F.2d 857, 860–61 (11th Cir.1991) (upholding the forfeiture of an Alabama farm and residence to which the wife held title despite her testimony that she was a battered woman and feared reporting her husband's illegal drug activity).

15. *See State v. One 1967 Peterbilt Tractor (In re Seizure & Intended Forfeiture of One 1967 Peterbilt Tractor),* 84 N.M. 652, 654, 506 P.2d 1199, 1201 (1973) ("[N]otwithstanding this is not a criminal proceeding, it is, nevertheless, on the principal issue involved in this appeal of such a nature that it is proper to gauge it by the same standards applicable in a criminal proceeding."); *State v. Cessna Int'l Fin. Corp. (In re Forfeiture of One Cessna Aircraft),* 90 N.M. 40, 42, 559 P.2d 417, 419 (1977) ("The forfeiture provisions of the Controlled Substances Act are penal in nature and consequently no pre-seizure notice or hearing is constitutionally required."); *State ex rel. Albuquerque Police Dep't v. One Black 1983 Chevrolet Van,* 120 N.M. 280, 282, 901 P.2d 211, 213 (Ct.App.1995) (quoting

*Cessna*, 90 N.M. at 42, 559 P.2d at 419, that forfeitures are penal); *State v. Ozarek*, 91 N.M. 275, 275–76, 573 P.2d 209, 209–10 (1978) ("The forfeiture provisions of the Controlled Substances Act are penal in nature."); *State v. Barela*, 93 N.M. 700, 701, 604 P.2d 838, 839 (Ct.App.1979) (stating forfeiture proceeding was quasi criminal), *overruled on other grounds by In re Forfeiture of 1982 Ford Bronco (State v. Stevens)*, 100 N.M. 577, 579, 673 P.2d 1310, 1312 (1983); *1970 Ford Pickup*, 113 N.M. at 99, 823 P.2d at 341 (quoting *Ozarek*, 91 N.M. at 276, 573 P.2d at 210, that forfeitures are penal); *$2730.00*, 111 N.M. at 749, 809 P.2d at 1277 ("The forfeiture provisions of the Controlled Substances Act are penal in nature."); *Albuquerque Police Dep't v. Martinez (In re Forfeiture of Fourteen Thousand Six Hundred Thirty Nine Dollars)*, 120 N.M. 408, 412–13, 902 P.2d 563, 567–68 (Ct.App.1995) [hereinafter *$14,639*] (stating that direct tie between forfeiture of property and commission of drug offenses confirms the punitive nature of forfeiture laws); *Schwartz*, 120 N.M. at 634, 904 P.2d at 1059 (concluding from *Kurth Ranch*, 511 U.S. at 768, 114 S.Ct. 1937, that forfeitures have "distinctly punitive purposes"); *City of Albuquerque v. Chavez*, 1997–NMCA–034, ¶ 19, 123 N.M. 258, 939 P.2d 1066 (mentioning quasi criminal concept), *rev'd on other grounds*, 1998–NMSC–033, 125 N.M. 809, 965 P.2d 928; *City of Albuquerque v. Haywood (In re Forfeiture of ($28,000.00))*, 1998–NMCA–029, ¶ 9, 124 N.M. 661, 954 P.2d 93 (mentioning quasi-criminal character of forfeiture and citing *Peterbilt Tractor* and *$14,639* ).

16. *See United States v. Lucero*, 1 N.M. (Gild.) 422, 449 (1869) (" '[S]o far as statutes for the regulation of trade impose fines or create forfeitures, they are doubtless to be construed strictly as penal, and not literally as remedial laws.' " (quoting *Mayor [of Philadelphia] v. Davis*, 6 Watts & Serg. 269, 276 (Pa.C.P.1843))); *Milligan v. Cromwell*, 3 N.M. (Gild., E.W.S. ed.) 557, 564, 9 P. 359, 362 (1886) ("The act of 1882 fixes the maximum of interest that may be recovered on such contracts at 12 percent per annum, but does not provide a punishment for charges in excess thereof, except the implied forfeiture of such excess."); *Scottish Mortgage & Land*

*Inv. Co. v. McBroom*, 6 N.M. 573, 588, 30 P. 859, 863 (1892) ("It is true that the statute makes such a transaction a misdemeanor, but the same statute prescribes the punishment, to wit, a fine of not less than $25 nor more than $100, and the forfeiture of double the amount of such interest so collected or received."), *aff'd*, 153 U.S. 318, 14 S.Ct. 852, 38 L.Ed. 729 (1894).

17. *Seward v. Denver & R.G.R. Co.*, 17 N.M. 557, 585, 131 P. 980, 989–90 (1913) ("The company, claiming a compliance with the order, should show that it had provided two seats, and had provided a ton of coal or a load of wood, but no stove; could this court punish by fine, forfeiture, or contempt for a failure to comply with the order?").

18. *See State ex rel. Erickson v. McLean*, 62 N.M. 264, 272, 308 P.2d 983, 988 (1957) (" 'Forfeiture is a "punishment annexed by law to some *illegal act* or negligence in the owner of lands, ... whereby he loses all his interests therein." ' " (quoting 2 Clesson Selwyn Kinney, *Treatise on Irrigation & Water Rights* § 1118, at 2020 (2d ed.1912))); *State ex rel. Reynolds v. South Springs Co.*, 80 N.M. 144, 146, 452 P.2d 478, 481 (1969) (same).

19. *See, e.g., Ozarek*, 91 N.M. at 276, 573 P.2d at 210 (quoting "quasi criminal" statement from *1958 Plymouth*, 380 U.S. at 700, 85 S.Ct. 1246); *$2730.00*, 111 N.M. at 749, 809 P.2d at 1277 (stating forfeiture proceedings are quasi criminal); *Haywood*, 1998–NMCA–029, ¶ 9, 124 N.M. 661, 954 P.2d 93 (mentioning quasi-criminal character of forfeiture and citing *Peterbilt Tractor* and *$14,639* ).

20. *See $14,639*, 120 N.M. at 412, 902 P.2d at 567. *See generally One 1995 Corvette v. Mayor & City Council*, 353 Md. 114, 724 A.2d 680, 682–85(Md.), *cert. denied*, 528 U.S. 927, 120 S.Ct. 321, 145 L.Ed.2d 251 (1999).

21. *Accord State v. Sunset Ditch Co.*, 48 N.M. 17, 26, 145 P.2d 219, 224 (1944); *1970 Ford Pickup*, 113 N.M. at 99, 823 P.2d at 341 (quoting *Ozarek*, 91 N.M. at 275–76, 573 P.2d at 209–10).

22. *See Shaffer*, 433 U.S. at 207, 97 S.Ct. 2569 (recognizing "that '[t]he phrase, "judi-

cial jurisdiction over a thing," is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing'" (quoting Restatement (Second) of Conflict of Laws § 56 introductory note (1971))); *ReMine ex rel. Liley v. District Court*, 709 P.2d 1379, 1382 (Colo.1985) (en banc) (stating the term "in rem" encompasses "any action brought against a person in which the essential purpose of the suit is to determine title to or affect interests in property").

23. *See Shaffer*, 433 U.S. at 212, 97 S.Ct. 2569 ("The fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification."); *The Chickie*, 141 F.2d 80, 86 (3d Cir.1944) ("The action in rem directs a plaintiff's claim to a thing. True, the plaintiff's judgment, if he is successful, affects persons, but only so far as concerns their interest in the thing, which is personified as a defendant in the litigation.").

24. *See Devlin v. State ex rel. New Mexico State Police Dep't*, 108 N.M. 72, 74, 766 P.2d 916, 918 (1988) (stating that the location of the property within the court's forum confers in rem jurisdiction when the defendant is absent); *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450, 462 (4th Cir.1992) (discussing maritime cases in which no owner came forward).

25. *See, e.g.*, Wells, *supra*, at 169 ("This resort to legal fiction is flawed because it elevates form over substance by failing to account for the reality of in rem forfeiture actions-namely, that civil forfeiture often does punish the owner of the property."); Brand, *supra*, at 305 ("The Court's willingness to justify, on such contrived arguments, the seizure of property as crucial as one's home is worrisome."); Leading Case, *supra*, at 210 n. 54 ("[I]f the Court does not rest its decision on the in rem basis of the proceeding, its opinion is left with only one justification: the naked force of precedent.").

26. *See Austin v. United States*, 509 U.S. 602, 616 n. 9, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) ("[F]orfeiture proceedings historically have been understood as imposing punishment despite their in rem nature."); *United States v. Baird*, 63 F.3d 1213, 1223 (3d Cir.

1995) (Sarokin, J., dissenting) (The forfeiture of property and monies "is dependent not on the criminal nature of the property, but on the illegal use their owners make of them.... Therefore, it is the owners who are punished by the forfeiture of such property." (citation omitted)).

27. *See* § 30–31–34; *see also Peterbilt Tractor*, 84 N.M. at 657, 506 P.2d at 1204 ("The risk of forfeiture is attendant on the factor of transportation or storage and not on the value of the vehicle used to transport or to keep."); *cf. Ex parte Ariza*, 913 S.W.2d 215, 221 (Tex.App.1995, pet. granted) (Smith, J., on motion for rehearing) ("The federal forfeiture statute contains no formula which attempts to correlate the value of the forfeited property with the government's damages."), *rev'd per curiam on other grounds*, 934 S.W.2d 393 (Tex.Crim.App.1996, no pet.).

28. *See generally* Blumenson & Nilsen, *supra*, at 35–114; David B. Smith, *Asset Forfeiture: A Serious Threat to Our Property Rights*, Briefly ... Perspectives on Legis., Reg., & Litig., Oct. 1998, at 4–7 [hereinafter Smith, *Threat*].

29. *See United States v. Ursery*, 59 F.3d 568, 574–75 (6th Cir.1995) (proof); Leach & Malcolm, *supra*, at 260 n. 81 ("Forfeiture is punitive because it involves a real transfer of value from the wrongdoer to the sovereign precisely because the wrongdoer has done wrong.").

30. *See United States v. German*, 76 F.3d 315, 319 (10th Cir.1996); *United States v. Torres*, 28 F.3d 1463, 1465 (7th Cir.1994); *McGowan v. United States*, 899 F.Supp. 1465, 1468 (W.D.N.C.1995).

31. We note that in 1996 the New Mexico Legislature passed a new Forfeiture Act that would have ameliorated many of the concerns, discussed in this opinion, that plague modern forfeiture. For unknown reasons, the Act was vetoed by the governor. *See* Forfeiture Act, S. 10, 42d Leg., 2d Sess. (N.M.1996) (vetoed Mar. 6, 1966). Included in the Act was a provision that shifted to the State the initial burden of proof in a forfeiture hearing: "The burden of proof is on the prosecution to establish, by clear and convincing evidence, that the property is subject

to forfeiture." *Id.* § 9(B). Law enforcement agencies would no longer be permitted to personally profit from forfeiture assets. Rather, the trial court would direct the disposition of forfeited property. Proceeds would go first to victim restitution and then to the general fund. *See id.* § 12. Another provision would have required a single proceeding for both the criminal action and the forfeiture, similar to the requirement we introduce in this opinion:

> A. A judgment for the forfeiture of property shall be entered only upon:
>
> (1) conviction of an owner of the property for a crime related to the forfeiture; *any forfeiture proceeding shall be brought in the same proceeding as the criminal matter: however, the two issues shall be bifurcated and presented to the same jury; and*
>
> (2) proof by clear and convincing evidence that the property is forfeitable under state law and that a person convicted of a crime related to the forfeiture is an owner of the property.

*Id.* § 4(A)(1) & (2) (as amended by S. Judiciary Comm., Jan. 30, 1996; amendment struck by S. Fin. Comm., Feb. 3, 1996). The New Mexico Senate Judiciary Committee incorporated the "same proceeding" provision, italicized above. This amendment would have obviated double-jeopardy claims like those before us today. This amendment was subsequently struck by the Senate Finance Committee, and, in any event, the entire bill was vetoed by the governor.

Interestingly, the United States House of Representatives recently passed the Civil Asset Forfeiture Reform Act which was similar in significant ways to our own vetoed Forfeiture Act. *See* Civil Asset Forfeiture Reform Act, H.R. Res. 216, 106th Cong., 1st Sess. (1999); *see also* Stephen Labaton, *House Passes Bill Making It Harder to Seize Property*, N.Y. Times, June 25, 1999, at A1 ("An unusual coalition of liberals and conservatives persuaded the House of Representatives to approve legislation Thursday to make it much harder for Federal and state law enforcement authorities to confiscate property before they bring criminal charges in narcotics and other cases."). This Court is obviously not alone in its concerns about inherent injustices of modern forfeiture law.

32. *See Christopher P. v. State*, 112 N.M. 416, 417, 816 P.2d 485, 486 (1991) (bifurcated hearing on motion to transfer matter from children's court to adult court, in which children's court judge first determined whether child committed delinquent acts, then addressed whether child was amenable to treatment); *State v. Luna*, 93 N.M. 773, 779, 606 P.2d 183, 189 (1980) (discussing bifurcated hearing when insanity defense is raised in which issue of insanity is separated from issue of guilt), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 151, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

33. Cheh, *Easy, supra*, at 46 (presumption); Smith, *Threat, supra*, at 4, 24 (hearsay, lawyer); Shannon T. Noya, Comment, *Hoisted by Their Own Petard: Adverse Inferences in Civil Forfeiture*, 86 J.Crim. L. & Criminology 493, 495–96 (1996); Blumenson & Nilsen, *supra*, at 47–50 (In an action against property "few of the constitutional safeguards imposed on criminal prosecutions apply.").

34. We note that *Santillanes* makes no mention of the fact that the United States Supreme Court discarded the *Linkletter* test in 1987. In *Griffith v. Kentucky* the high court adopted a rule of universal retroactivity, holding that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Griffith*, 479 U.S. at 328, 107 S.Ct. 708. Our courts have never, except incidentally, expressed approval or preference for the rule of *Griffith. See, e.g., State v. Acosta*, 1997–NMCA–035, ¶ 10, 123 N.M. 273, 939 P.2d 1081 (mentioning the *Griffith* rule); *Stroh Brewery Co. v. Director of N.M. Dep't of Alcoholic Beverage Control*, 112 N.M. 468, 480 n. 12, 816 P.2d 1090, 1102 n. 12 (1991) (Montgomery, J., dissenting) (noting that *Linkletter* was "severely undercut" by *Griffith* ).

35. *See* Rule 12–216(B) NMRA 1999 (on appeal question must be preserved below, be of general public interest, or involve fundamental error); *State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991) (fundamen-

tal error applies even if the issue is not preserved below).